Morris, D. J.
Collision between the schooner Ella Kirkman and the steamer Westover.
The libel alleged that on November 3, 1879, the schooner Ella Kirkman, an oyster pungy of 26 58-100 tons, laden with 800 bushels of oysters, was proceeding up the Chesapeake bay, bound for Baltimore, her proper lights burning, the wind blowing hard from north-west, the schooner close hauled on her port tack, steering north-east, making three to four knots an hour, under double reefed mainsail and foresail, and bonnet out of the jib, when between 8 and 9 o’clock p. m., near the mouth of the Patapsco river, about a mile south by oast from the seven-foot knoll, the lookout saw the lights of the steamer Westover, coming down the river towards the schooner, a mile and a half off; that the schooner kept her *92 course, and when the steamer was close to her hailed and warned her off, but the steamer continued her course, and struck the schooner amidship, and so injured her that she sank in a few minutes.
The answer on behalf of the claimants of the steamer Westover alleged that the steamer was on her route from Baltimore to Norfolk, with her proper lights burning, a lookout on the forward deck, and her captain and second mate in the wheel-house; that when she reached a point half-way between the south-east buoy and the seven-foot knoll those in charge of the steamer saw the red light a mile and a half off, and immediately after saw both lights of the schooner one point on vhe steamer’s starboard bow; that at this time the steamer was showing the schooner both of her lights, and the vessels were approaching nearly head on, and were about a mile and a quarter apart; that in a few minutes the schooner shut in her green light and showed her red, indicating that she had changed her course to the eastward; that when those in charge of the steamer observed this change they changed the steamer’s course to the westward; that in a few minutes the schooner shut in her red and showed her green light, indicating that she had changed her course to the westward; that the vessels were, at the time, about half a mile apart, and seeing this last mentioned change the captain of the Westover ordered her helm hard a starboard; that when the vessels had approached within 200 yards of each other the schooner again shut in her green light and ran across the bow of the steamer; that as soon as the last change was indicated the steamer blew her whistle and reversed her engines at full speed, and made every effort to avoid the collision.
The answer admits that from the first moment of sighting the schooner’s light the two vessels were approaching nearly head on, and, therefore, from the first they were aware there was danger of collision, and that it was the duty of the steamer to take timely and effective means to prevent it.
The rule is well settled that if the lights of the sailing vessel are fluctuating, or for any reason there is uncertainty as *93 to her course, the steamer must in time slacken her speed, and, if necessary, stop and back, and neither proceed nor change her course until the course of the sailing vessel has been ascertained. 17 How. 178; Peck v. Sanderson, 21 How. 6; The Steamer Louisiana, 5 Blatch. 256; The Illinois, The Harvest Queen, and The Adriatic, opinion of Chief Justice Waite, Circuit Court, S. D. of New York; The Herman, 4 Blatch. 441. A clearer ease of admitted facts, requiring the observance of this rule, is rarely met with. When half a mile off the steamer had already witnessed four changes in less than four minutes in the lights of a sailing vessel directly ahead of her, yet she did not slacken from her speed of nine knots an hour, but continued porting and starboarding until within 200 yards, when at last, but too late, she reversed her engines.
That there was in the captain’s mind great uncertainty as to the course of the schooner is apparent from his own testimony, and from that of the second mate, who was with him in the wheel-house.
In his testimony, after describing how he first saw the schooner’s red light, and then saw both, and then saw her red light again, he says he then ordered his helm to port, and about as soon as they got the wheel over the schooner Bhowed her green light, about 200 yards off. He says he then said to the mate: “She is either going about, or he has let her come up into the wind, and I told the mate” (not to slacken speed, as one would suppose, but) “to heave his helm hard a starboard.” Next he says: “I could not see any lights, but could see her sails, and then I blew the whistle and gave the order to stop and back. I was then as far east as I could go without getting aground, and she was right under my bow.”
The mate’s testimony corroborates the captain’s in every particular.
An examination of the testimony for the libellants very clearly shows why it was that the lights appeared so fluctuating to those on the steamer. The schooner was almost directly ahead, the water was very rough, and the small schooner conse *94 quently very unsteady, and the wind was blowing hard in flaws. She was trying to make the mouth of the river, and sailing as near to the wind as she could. To a vessel directly ahead her lights were liable to present a fluctuating appearance from three causes: First, the flaws in the wind; second, the plunging of so small a boat in a rough sea; and, third, the occasional obscuring of her starbord light by her jib. The testimony of Captain Morris, of the Masonic Hall, another oyster vessel, confirms this. He says that he, in company with the Ella. Kirkman, had been anchored for shelter under the highlands of the Magothy river, and when the weather had moderated they got under way together to come up to Baltimore; that he was about half a mile ahead of the Ella Kirkman, and the steamer passed him a quarter of a mile to the westward of the seven-foot knoll; that it was blowing hard and the water rough, and he did not tack until abreast of North Point, and that there was no need for the Ella Kirkman to tack; that she was behind him, and he could see her red light, and that he could have seen both her lights, except her jib shaded her green light.
The evidence altogether is conclusive that the schooner did not change her course. The testimony of Mahon, one of the-two lookouts on the bow of the schooner, was much commented on by counsel for the steamer. He says: “I saw the steamer’s lights directly ahead, sometimes over the port bow, and sometimes over the starboard.” This I think is-satisfactorily accounted for, partly by the luffing of the schooner, as the wind varied, partly by her unsteady motion in the rough water, and partly by the changes made by the steamer in her own course, as she constantly changed her helm, and it does not prove any change of the schooner’s course. It does not appear, therefore, that the schooner did not do all that was required of her by any nautical rule. It was her duty to keep her course, and it was the steamer’s duty to avoid her, and the serious consequences which have resulted are to be visited upon the steamer alone. They serve to show the practical wisdom of the rule which requires *95 the steamer, in every ease of uncertainty with regard to the course of a sailing vessel with which she may come into collision, not to proceed or to change her course while that uncertainty remains.
With regard to the damage, I do not think the amount claimed is excessive. The value of the vessel, including all her equipment for her business of oystering, is put at $1,200; and I think the testimony shows it to be a fair valuation, and that, at that time of the year, when the oyster season had just begun, she could not be replaced for a less sum. The other amounts of loss seem to be reasonable, and I will sign a decree in favor of libellants for $1,558, and costs.