## THE PORTIA.

### NEW YORK, N. & H. STEAMSHIP CO. v. CORNELL STEAMBOAT CO.

(Circuit Court of Appeals, Second Circuit. December 5, 1894.)

#### No. 15.

COLLISION—FAILURE OF STEAMER TO STOP AND REVERSE PROMPTLY — PROXIMATE CAUSE.

A steamship going down the East river, on entering the channel west of Blackwell's Island, discovered, coming up half a mile below, two tugs towing seven loaded canal boats, lashed to one of the tugs, the other tug leading with the hawser attached. They were on the easterly side of the channel, heading at an angle towards the New York shore, and the tide was flood. The steamship, proceeding at half speed near the New York shore, gave a signal of one whistle, intending to pass port to port, as required by the state statute. The leading tug responded by a similar signal, but, though she ported her wheel and went ahead at full speed, the other tug stopping her engine, their course was not materially changed, and they and the tow were carried by the tide towards the New York shore until, when the steamship had come within 300 or 400 yards, it was no longer safe for her to pass on that side. Thereupon she changed her course two points to port, and gave a signal of two whistles, to which the second tug responded by a like signal, and put her engines full speed ahead; but the movements of the tugs and tow were very sluggish, and they drifted with the tide as before. Observing this, the steamship reversed her engines, but by the time her headway was stopped her bow had swung a point to starboard, and she struck the outer starboard canal boat, which sunk. *Held*, that the steamship was in fault in failing to stop and reverse at the time of her change of course, notwithstanding that the hazardous situation was

brought about by the failure of the tugs to perform their obligations, and that their fault, though gross and inexcusable, was not the proximate cause of the collision, as the steamship could have avoided it by obeying the rule.

Appeal from the District Court of the United States for the Eastern District of New York.

This was a libel by the Cornell Steamboat Company against the steamship Portia, the New York, Newfoundland & Halifax Steamship Company, claimant, for damages for the sinking of canal boat No. 3037, while in tow of libelant's steam tugs R. G. Townsend and S. L. Crosby, by collision with the steamship. The district court rendered a decree for libelant. Claimant appealed. .

Wilhelmus Mynderse and Butler, Stillman & .Hubbard for appellant.

Benedict & Benedict, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. The owners of the steamship Portia have appealed from a decree of the district court condemning her in damages for a. collision which took place in the East river opposite Blackwell's Island. The libel and answer in the cause are commendably full and specific, and the testimony of the witnesses for both parties has been exceptionally candid. The facts are these: The steam tugs S. L. Crosby and Townsend were proceeding up the river on a flood tide, which was running three or four miles an hour, with a tow of seven loaded canal boats. The Townsend was leading by a hawser .60 feet long, attached to the Crosby, and the Crosby had four canal boats lashed to her starboard side, and three lashed to her port side. The river at that point is about 700 feet wide, and the length of the entire tow was about 250 feet. While the tugs and tow were on a course heading towards the New York shore, in order to be able to enter the Harlem river on the flood tide, the rear of the tow being about 150 feet from the Blackwell's Island shore, and the Townsend being well out towards mid-river, they were discovered by the steamship Portia, which had just rounded Horn's Hook and had straightened down the channel, and was about half a mile away. The Portia was proceeding at half speed, well in towards the New York shore of the river. She was an ocean steamer 230 feet long. Upon discovering the tugs and tow, she gave them a signal of one whistle. The Townsend immediately responded by a similar signal, ported her wheel, and went ahead at full speed. The Crosby stopped her engine. Notwithstanding the Townsend's efforts, she could not materially change the course of the tow, and when the vessels had approached to within a distance of three or four hundred yards of each other the tugs and tow had been carried by the tide well over towards the New York shore, the Townsend being only about 250 feet away from it. Owing to the proximity of Mason's reef, the available path open to the Portia between the Townsend and the shore was not more than 150 feet

wide. Thereupon the pilot of the Portia, fearing that his vessel would be crowded upon Mason's reef, if the courses of the vessels were not altered, changed the course of the Portia two points to port, and gave a signal of two whistles to the tugs and tow. The Crosby responded to the Portia's signal by a like signal, and put her engines full speed ahead. Notwithstanding, the movements of the tugs and tow were very sluggish, and they continued to drift with the tide practically as they had been doing before. Under the influence of her starboard helm, the Portia swung towards the Blackwell's Island shore, but, observing the sluggish movements of the tugs and tow, and believing that the Portia would strike one of the starboard vessels of the tow if she continued, the pilot ordered her engines reversed. This order was immediately obeyed, but by the time her headway in the water had been stopped the bow of the Portia had swung about a point to starboard. The Portia struck the outer starboard canal boat of the tow about 10 feet from the stern, and in consequence the canal boat sank.

By a statute of this state applicable to the waters of the East river, it was obligatory upon the Portia and the steam tugs, meeting as they were, to pass one another port to port by going on their respective starboard sides of the river. Although the tugs were embarrassed by a heavy tow, and were going with the swing of the tide, the Portia had no reason to apprehend, when she first discovered them, that they were incapable of controlling their own navigation. They were well on the easterly side of mid-river. The Portia was not only justified in giving her first signal of one whistle, but, under the rules of the board of supervising inspectors, she would have been remiss in duty if she had omitted to do so. If the tugs were unable to adhere to the ordinary statutory rule of passing port to port, they should have signified their dissent by a signal of two whistles. When the Portia's signal was assented to by the answering signal from the Townsend, the Portia had a right to assume, until the contrary became obvious, that the tugs could and would so control their movements as to allow her sufficient room to pass on their port hand. As the vessels approached each other the tugs steadily encroached upon the waters available to the Portia until the time came when the Portia had a right to believe that it was no longer safe for her to persist in the course agreed upon. Her path of available waters between the Townsend and the shore was about 150 feet wide, and by the time the intervening distance of three or four hundred yards between the vessels could be covered it was manifest that the Townsend, as she was then going, would have crossed this narrow path, and it would have been occupied by her tow. Under these circumstances it would have been manifestly imprudent for the Portia to have adhered to her original purpose of passing the tugs and tow port to port. It is entirely plain that this situation was brought about by the failure of the steam tugs to perform their obligations. Whether their failure to do so was because the masters of the two tugs were at cross purposes, as they apparently were when one stopped his engine and the other

ported his wheel and went ahead at full speed, or whether it was because the tugs were of insufficient capacity to manage their heavy tow under the conditions of the tide, is not material. It suffices that they were remiss. As a consequence of their remissness the Portia was placed in a hazardous emergency and the situation involved risk of collision. Inasmuch as the tugs and tow had been drifting across the path of the Portia during all the time when they should have been swinging to the starboard, it is not strange that the pilot of the Portia should have supposed that their movements could be readily accelerated in the direction they were drifting, if the pilots would make the endeavor. But the event proves that this was a misapprehension, and, although the pilots did what they could, the tugs and tow drifted with the tide, after the Portia changed her course to port and the tugs assented to that movement, practically as they did before. When the collision took place the Townsend was quite close to the docks on the New York shore, and the situation of the tow at that time proves that it would have been impossible for the Portia to have passed on the port side if she had kept on her original course, instead of changing it to port.

Notwithstanding all the extenuating circumstances, the Portia must be held in fault for the collision. When the situation had become so critical that she was obliged to deviate from the course which had been agreed upon between the vessels, it was her imperative duty under rule 18 to slacken speed, or, if necessary, stop and reverse, unless there were special circumstances rendering a departure from the rule necessary in order to avoid immediate danger. It is not claimed that there were any such special circumstances; and the Portia's course was changed to port because her pilot supposed he could pass the tow in safety on the tow's starboard side, especially if the tugs co-operated towards rendering that maneuver safe. The situation was not one in extremis, because the distance between the vessels was ample to enable the Portia to avoid collision by reversing, especially as she was moving against a strong tide. When, instead of obeying the rule of navigation by stopping or reversing, the Portia concluded to proceed by altering her course to port, she took that course at her own risk. Although she subsequently reversed, and did what was in her power to avoid collision, her fault in disobeying the rule was fatal. The fault on the part of the tugs, though gross and inexcusable, was not a proximate cause of the collision. An antecedent act of negligence is remote when, notwithstanding, the other vessel, by the exercise of ordinary care, can avoid a collision; and if, notwithstanding the fault of the tugs, the Portia could have avoided the collision by obeying the rule, which under the circumstances was imperative, she alone must be condemned.

The decree of the district court is affirmed, with costs.