## THE MAVERICK.

### AMERICAN MANUF'G CO. v. THE MAVERICK.

### HALL et al. v. SAME.

(District Court, E. D. New York. July 17, 1896.)

1. COLLISION—SAIL WITH STEAMER AND TOW.
   The fact of having a tow upon a hawser does not absolve a steamer from the duty of keeping clear of an approaching sail.

2. SAME—LIGHTS—EVIDENCE.
   The supposition is not to be indulged that a schooner, in good repair, and sailed by her master on shares, carried her red light so that it would show across her bows to a steamer whose course she was approaching from the port side. An alleged fact of this character must be clearly proved, and not presumed.

3. SAME—LIGHTS—CROSSING COURSES.
   The fact that the light of a schooner seen on the port bow of a steamer (even if it were red, instead of green, as claimed by the steamer's

officers) did not change its bearing, *held* to have been sufficient notice that the schooner was approaching on a crossing course; and the failure of the steamer to change course or stop, *held* to have placed her in fault.

4. SAME—FAILURE TO CALL UP MASTER.

Failure of a competent and experienced mate of a schooner to call the master from below, when approaching, on crossing courses, a steamer whose light was clearly seen, *held* no fault; the duty of the schooner to keep her course being clear.

5. SAME—CHANGE OF COURSE IN EXTREMIS.

Alleged error of a schooner meeting a steamer, in starboarding instead of porting, *held* no ground of liability, where the change was made only after the steamer's failure to alter her course had produced extreme danger of collision.

These were two libels for collision, brought, respectively, by the American Manufacturing Company and by John W. Hall and others, against the steamship Maverick.

Geo. A. Black, for libelants American Manuf'g Co.

Wilcox, Adams & Green, for libelants John W. Hall et al.

Wing, Shoudy & Putnam, for the Maverick.

BENEDICT, District Judge. These actions are brought to recover damages sustained by the libelants in the total loss of the schooner Ettie H. Lister and her cargo in a collision with the steamship Maverick, which occurred on the high seas, on the 1st day of October, 1894. The schooner left New York on that day, bound for Wilmington. She was sailing at a speed of five knots an hour, under full sail, with a fair breeze. Her course for an hour or so before the collision had been S. W. ½ W. The steamer was bound up the coast to New York, having in tow a barge upon a hawser 1,200 feet long. Her course was N. E., and her speed six knots. The wind was about west. The night was clear. The steamer made no changes of course or speed until just before the collision. Then she starboarded, but struck the schooner in the mizzen rigging on the starboard side, causing her to sink in a few moments. At the time of the blow the schooner's helm was hard a-starboard.

Under the circumstances it was the duty of the steamship to avoid the schooner, and the burden is upon her to explain her failure to do so. From this burden she is not relieved by showing that she had a barge in tow. Her main defense is that she saw the schooner's red light, and did not see any green light on her; that, seeing the red light only, her master supposed the light to be on a vessel approaching on a course parallel with his, and, as he was displaying to her his red light, it was red to red, and he could keep on his course without danger. In fact, the schooner was approaching the steamer from the port side on a course crossing that of the steamship, and her red light, if properly arranged, was not displayed to the steamer. On the part of the steamship it is contended that the red light of the schooner was so arranged as to show across her bow, and so was displayed to the steamer as she approached her. But there is no evidence to show such an arrangement of the schooner's red light. The schooner was kept in good repair, and had been in constant employment. She was sailed by her master on shares, and it would be so hazardous to sail down the coast in the night with her red light

so arranged as to show to this steamer across her bows that the supposition of such an arrangement cannot be indulged in. Such a fact requires to be clearly proven. It must not rest on supposition.

The failure of the steamer to see the green light on the schooner is claimed by the steamer to have been caused by the fact that the schooner did not have a green light burning. Upon the question of whether the schooner was displaying a green light the steamer produces many witnesses from the steamer's deck, who were watching the schooner, and who say that they saw her red light, but no green light. The proof introduced on the part of the schooner is convincing that her light was set up about 6 o'clock and was then burning. Of course, the light may have gone out after it was set up, but there is no direct evidence that it did go out. On the contrary, the witnesses from the schooner testify positively that it did not go out until the steamer struck the schooner. The mate of the schooner testifies that, after the steamer was reported by the lookout, he went forward and saw the green light burning. The lookout says that he saw it burning until it was put out by the shock of the collision.

But if, on this testimony, it should be held that the weight of evidence shows that the schooner failed, by not displaying a green light, to notify the steamer that she was approaching on a course crossing that of the steamer, still there is a fact proved by the steamer's witnesses which shows her to have had notice that the schooner, which the captain of the steamship supposed to be on a parallel course, was in fact approaching on a crossing course. This fact is that the light which those on the steamer say they saw on the schooner did not change its bearing. This fact is testified to by several witnesses from the steamer, and, indeed, is alleged in the answer. It gave sufficient notice to the master that the schooner was approaching on a crossing course. The master says he noticed the fact, but never thought about it, and made no change in his course or his speed. This was a great fault. Because, after seeing the light of the schooner approaching him on his port bow without change of bearing, he did not stop or change his course, he must be held in fault, and responsible for the collision which ensued. The Gray Eagle, 2 Biss. 25, Fed. Cas. No. 5,735. See Mars. Mar. Coll. (2d Ed.) p. 350.

It remains to be considered whether the schooner was also in fault. Three faults on the part of the schooner are insisted upon: (1) Putting up the green light untrimmed; (2) in not calling the master from below when danger appeared; (3) in putting the helm up, and keeping it so, in a vain attempt to cross the steamship's bows. As to the trimming of the light, the testimony is that the light was trimmed. The lights were not filled that night because they had been filled since they had been used. There is no evidence that the lamp was not full of oil. It was put up a little before 6 and then burned well. The collision occurred a little after 7. It is highly improbable that the lamp went out in so short a time for want of oil or trimming. Proving that the lantern was old does not prove that the light was bad. The lamp had been in constant use

for many years. On a trip previous some of the plaster of Paris had come off, causing the light to go out, and it was then repaired. The presumption is that it was put in good condition. It appears that the lookout of the schooner was on the sheer pole in the main rigging, just under the green light, shortly before he reported the steamer, and it is contended that he must have been there to fix the light. He swears that that was not his object, and that he did nothing to the light. If the light was out, I should suppose the lantern would have been taken down by this man and relighted. It was surely a bad place to light a lamp in. There is testimony from the steamer that, at the time of the collision, the captain of the steamer sung out to the schooner, "Where is your green light?" The master of the steamer testifies to this, as do also two seamen from the steamer. But the two witnesses who confirm the captain did not come on deck until after the vessel struck. It is most probable, I think, that this call was after the vessel struck, and it is hardly sufficient to overcome the positive testimony from the schooner that her light was burning.

The next ground of complaint is that the mate did not call the master before he starboarded his wheel. But there was nothing in the situation that made the presence of the master on deck necessary. The steamer had been seen for some time. It was the duty of the steamer to avoid the schooner. The schooner's duty was clear. The mate who was in charge was a competent man, had been a master himself for many years, and did what the situation called for. He held his course until the steamer was upon him. When he starboarded the danger of collision was imminent, and it was plain that he would run into the tow if he kept his course. The master of the steamer says the schooner did not change her course until he saw her on top of him. Then, when it was plain that there would be a collision if she kept her course, he starboarded hard. The steamship had a tow extending behind her some 1,560 feet. I am unable to see that it was error to put the schooner's helm to starboard, instead of to port. In the presence of such a tow, approaching her course and so near at hand, it was scarcely possible to clear by porting. On this point the testimony of the master of the steamer is suggestive. But, if it was a mistake to starboard the helm, the mistake is to be laid at the door of the steamship, which held her course until danger of a collision was extreme. The master of the steamer testifies that he did not change his course until he was within a length of the schooner, and when he could see the loom of the schooner's sails,—when, as he says, the schooner was on top of him.

None of the faults charged against the schooner appear to me to be sustained by the weight of the evidence. Upon the evidence the steamer seems to me solely responsible for the collision, and she must be held liable for the loss that ensued. Let a decree be entered in each case in favor of the libelants, with an order of reference to ascertain the damages.