THE WESTHALL.

(District Court, E. D. Virginia. March 2, 1899.)

1. COLLISION—BURDENED VESSEL—STEAMER AND TUG WITH TOWS.

As between a steamer and a tug with a cumbersome tow, the latter has the right of way, and upon the steamer is imposed the responsibility of exercising extra precaution to avoid collision.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 75.]

2. SAME—DEFENSE TO LIABILITY.

Precautions required by law to be taken when there is risk of collision must be taken in time to be effective against such risk, or they will constitute no defense to liability if collision occurs.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 15.]

3. SAME—TOW ON WRONG SIDE OF CHANNEL.

The fact that a tug with a large tow was on the wrong side of the channel, if admitted, would not prevent a recovery for a collision with a meeting steamship which, having the tug and tow in full sight in the daytime for a distance of 2½ miles, violated her plain duty to keep out of the way, as she might readily have done.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 34.]

4. SAME—CONTRIBUTORY FAULT—EVIDENCE TO ESTABLISH.

Where the vessel on which rested the burden to avoid a collision was chargeable with faults sufficient in themselves to account for the colli-

sion which occurred, she cannot escape liability on the suggestion of possible faults on the part of the other vessel, which is entitled to the benefit of all reasonable doubts.

[Ed. Note.—For cases 'in point, see Cent. Dig. vol. 10, Collision, § 42.]

**5. SAME—EVIDENCE CONSIDERED—STEAMER AND MEETING TOW.**

A tug with seven barges in tow passing down Elizabeth river in the daytime found it necessary to cross to the western side of the channel in order to take her tow to an anchorage on the Newport News flats, and had passed entirely out of the deep-water channel with all of her tows, except the last, which was still from 125 to 150 feet in the channel, when it came into collision with 'the steamship Westhall passing up the channel. The channel was at the place 500 feet wide, and the tow had been in view of the Westhall for a distance of 2½ miles. The wind was from the west, and the tide 'flood, which somewhat retarded the movement of the tow to the westward. *Held,* that it was the duty of the Westhall to either stop at a safe distance until the barge was clear of the channel or to keep to the eastward, as she could easily have done, and that she was solely in fault for the collision.

In Admiralty. Suit for collision.

Whitehurst & Hughes, for libelant.

J. Parker Kirlin and Robert M. Hughes, for respondent.

WADDILL, District Judge. On the morning of the 3d day of April, 1896, about 9:30 o'clock, as the libelant's steam tug Peerless was proceeding down the Elizabeth river with seven barges in tow, the tow being some 1,320 feet in length, the respondent's steamer Westhall, an ocean-going steamship, collided with the E. E. Jackson No. 4, the rear barge in the tow.

The contention of those in charge of the tug and tow is that it became necessary and desirable, by reason of the condition of the wind, for the tow to cross from the eastern to the western side of the channel at a point between Crany Island Light and Boush's Bluff, with a view of coming to anchor on the Newport News flats, and after the tug had passed Boush's Bluff, and was herself far over to the westward of the channel with all the seven barges, save one, outside of the channel on its western side, and to the westward of the buoys, that the Westhall, upon proceeding down the channel from Newport News to the mouth of the Elizabeth river, and thence up the river, and having observed the presence of the tug and tow a distance of two and a half miles away, with nothing to obstruct the channel or disturb the navigation of the ship, she, without giving proper signals either of danger or to pass, ran into and upon the rear barge, causing the injury sued for; whereas the respondent contends that the Westhall was free from fault, that she left the elevator at Newport News at 8:20 on the morning of the collision for Lambert's Point, under charge of a Virginia pilot, and with a proper and efficient lookout, drawing 23 feet 2 inches of water, the wind blowing a fresh gale from the west, and, after turning into the channel of Elizabeth river off Sewell's Point at can buoy No. 4, the navigators of the steamer observed ahead the tug and tow at a distance of 2½ miles away, which were taking up most of the channel, the tug being far to the westward, headed between north and west, making it impossible for the steamer to pass on the western side of the channel, so she kept on cautiously,

frequently stopping or slowing down, keeping only steerage way, with the intention of passing to the eastward of the barges, but that, on approaching nearer, it became evident that the tug and tow were taking practically the entire deep water channel for a ship the size of the Westhall. · She thereupon stopped at a distance of some three lengths of the ship from the barges and starboarded to get as far as possible out of the way, which maneuver caused her to ground on the eastern side of the channel, when the Jackson drifted down and struck her on the starboard bow, thereby causing the injury. Considerable evidence was taken by the parties, respectively, and the usual conflict in collision cases was increased by the large number of witnesses examined from the crews of the ship and of the tug and tow.; and, while in many particulars the conflict was irreconcilable, still they differed largely about immaterial and unimportant matters. or upon points as to which persons viewing the same object would naturally differ, but the court was fortunate in having the benefit of the testimony of a number of disinterested witnesses who either saw, or were so recently at the scene of the collision, or so familiar with its surroundings, as to be able intelligently to speak of the facts.

The conclusions reached by the court upon a full review of the entire evidence, and after hearing arguments of counsel, are that the collision did not occur as contended for by the respondent; that is to say, by the obstruction of the entire channel, by the barges, the running aground of the steamship, and the collision therewith by the rear barge while aground. This theory is at utter variance with the evidence, or certainly any considerable part of it, and is demonstrated not to be true beyond peradventure by the physical facts and circumstances of the case. The blow of the collision shows that it could not have so occurred, as the injury to the barge could never have happened by the coming into collision of the starboard quarter of the barge with the starboard bow of the steamship, the latter lying still, as contended for by the respondent, and the barge drifting against it. Indeed, not only does the libelant's evidence show that it did not and could not have so happened, but one at least of the respondent's witnesses, Capt. William J. Bartlett, a man of experience and intelligence, and in no way interested or connected with the case, and himself master of an ocean tug with a large tow at the time near the scene of the accident, testified in effect that it could not have so happened; that the tide was then as it had been for some time, running flood; that the tug was moving the tow gradually out of the channel to the westward, and that the tide would have swept the barge up the river, and from the Westhall, instead of against it; and that it was impossible for it to have drifted with the wind and tide as they were down on and against the steamship. He also testified that some time before reaching the scene of the collision, and as far away as Boush's Bluff, he observed the rear barge then a little to the east of midchannel, and it was gradually moving to the westward of the channel; that after the collision, before the tug had gone to the aid of the injured barge (which the evidence shows to have been from five to eight minutes), and before the steamer had gone forward, he with a large tow, consisting of a barge 328 feet long, and drawing 23½

feet of water, lashed to his starboard side, passed between the barge and steamship, and proceeded down the river; the steamship being at the time on the eastern side of the channel. It is quite evident that the collision occurred by the stem of the steamship while moving coming into collision with the starboard quarter of the barge, and not by the latter's drifting into the steamer after she had run aground. Under the law, it would be difficult for the Westhall to escape responsibility for this collision, assuming it occurred as contended for by her. If the channel was entirely blockaded, as she insists, with a large unmanageable tow extending from its western border to and over its eastern side, with the tug endeavoring to move the same out of the channel, and impeded by the wind and tide, there was no excuse for the steamer's running into the barge. The tow's plight was apparent, and the steamer should neither have run into nor approached the same in such close proximity as to be unable to avoid the collision. The tug and tow was the incumbered vessel. The steamer was entirely free, and under the circumstances should have kept out of the way. "A tug with vessels in tow is in a very different condition from one unincumbered. She is not mistress of her motions. She cannot advance, recede, or turn either way at discretion. She is bound to consult their safety, as well as her own. She must see that what clears her of danger does not put them in peril." The Syracuse, 9 Wall. 675, 19 L. Ed. 783; Marsden, Coll. (4th Ed.) 185, 186. The reason for not requiring the same strictness of compliance with the rules of navigation by those in charge of a tug and tow as of those navigating an unincumbered steam vessel is manifest, and as between a steamer and a tug with a cumbersome tow the latter has the right of way, and upon the steamer is imposed the responsibility of exercising extra precaution to avoid collision. The Alleghany, 9 Wall. 522, 525, 19 L. Ed. 781; The Mayumba (C. C.) 21 Fed. 476; The Fred W. Chase (D. C.) 31 Fed. 94; The Rose Culkin (D. C.) 52 Fed. 328; The Lucy (C. C. A.) 74 Fed. 572, 20 C. C. A. 660; Spencer on Coll. 264, 275, 276. It will not do to say that the Westhall did what she could after the emergency became imminent. If she delayed unduly to avoid this collision, and such failure brought it about, she is liable. The obstruction was seen in the channel for a distance of 2½ miles, and, while it is true the claim is made that the steamship from time to time checked her course moving up the channel, still to have gone within 1,000 feet of the barges across the channel—that is to say, so close that, when she undertook to stop and starboard her helm, the collision was inevitable from the barge running into it—under the circumstances of this case was inexcusable. Not only did the Westhall proceed up the river for over a mile and a half in the face of an apparent danger, which was entirely removed within five minutes after the collision, but she approached recklessly near to the obstruction in her way before taking the necessary and proper precautions to avoid the collision. The steamship should have done more than merely shape her course, or slacken her speed so as possibly, or even probably, to avoid the collision with the tug and tow claimed by her to be unmanageable. She should have allowed sufficient margin for safety, taking into consideration all of the impending contin-

gencies of navigation; and for loss occasioned by her failure so to do she is clearly responsible. Mars. Coll. at Sea (4th Ed.) 377, 384; The America, 2 Otto, 432, 23 L. Ed. 724; The Saratoga (D. C.) 1 Fed. 730; The Chatham, 52 Fed. 399, 3 C. C. A. 161; The Owego (D. C.) 71 Fed. 537, 544.

The Westhall's contention is that at the time she starboarded she could not then have reversed, as that would have tended to throw the head of the steamship to starboard, and more than likely have increased the chance of collision; but this in no manner accounts for the failure sooner to stop, and, if needs be, to have reversed and backed away from the so-called obstruction floating down the river. No pretense is made that the engines were reversed. Under Navigation Rule No. 21 (Rev. St. § 4233 [U. S. Comp. St. 1901, p. 2898]), upon the risk of collision arising, the steamship should have slackened her speed, and, if necessary, have stopped and reversed, and the fact that she delayed doing so until, upon starboarding her helm to avoid the collision, it was found too late to reverse, will not avail either to relieve from responsibility or to cause others to share the losses arising from such failure. The Reading (D. C.) 43 Fed. 400; The Portia, 64 Fed. 811, 72 C. C. A. 427; The Berkshire, 74 Fed. 906, 21 C. C. A. 169; The Maverick (D. C.) 75 Fed. 845; The Westover, 5 Hughes, 133, 2 Fed. 91. "The precautions required by law to be taken where there is risk of collision must be taken in time to determine that risk. An alteration of the helm, or other step taken in pursuance of the regulations, is no defense, unless it be shown that such precaution was taken at the proper time. To be effectual, precautions must be taken seasonably. If taken at an improper time, they are not a compliance with the regulations, and are no defense. If you adopt a measure at an improper time, it does not take away the culpability of not having done it before and prevented the accident." Mars. Coll. at Sea (4th Ed.) 384, and cases cited. Capt. Bartlett, respondent's witness, shows that there was no difficulty in the steamship stopping and waiting for this obstruction in the channel to get out of the way, as he did with the ocean tug and the large tow it had, as above mentioned. And another of respondent's witnesses, Capt. Cunningham, in charge of the steamship, testifies that there was no difficulty in stopping the steamship at the entrance to the channel.

Coming to the question of how the collision occurred, and the responsibility therefor, the court will consider the position of the barges relative to the channel at the time of the collision. It seems clear that they were not only not across the channel, or to the eastward thereof, but that they had been to the western side for quite a while prior to the time of the collision, and that at that time all of the barges, save one, were out of the channel, and that it, with its hawser, extended in the channel possibly some 125 or 150 feet on the western side. This is apparent from the fact of the position of the barges immediately after the collision, as testified to by the witnesses on both sides. It is settled almost beyond dispute that the barges, other than the injured one, were anchored outside of the channel and to the west of the buoys, and that the tug and tow had, with the exception of the rear barge, pulled out of the channel heading across the flats previous

to the time of the collision. Indeed, those in charge of the steamship observed the movement and the course of the tug and tow when coming into the channel. The master of the steamship and the pilot both testified that their ship bore to the westward side of the channel in coming up from the mouth of the river, keeping some 50 feet to the east of the buoys until within about 3 lengths of the ship, or 1,000 feet from the barges at the time the steamship starboarded, as above mentioned, and, in this connection, it should be mentioned that the pilot, Cunningham, of the Westhall, seemed to have been under the impression that the deep-water channel at the point of the collision was only 100 feet wide, whereas, in fact, it was 500 feet, and this circumstance may account largely for the conduct of those in charge of the ship, though they will not be excused either for not knowing the width of channel or for going into dangerous proximity to the obstruction before taking the proper precaution to avoid it. The channel was 500 feet wide, and the barge in collision extended into it on the western side only some 125 or 150 feet; and it follows that, if the Westhall had starboarded earlier, she could easily have passed under the stern of the rear barge without the slightest danger of collision, just as other ocean steamships passed the same tug and tow before it was so far to the western side of the channel, and, indeed, before it had pulled out of the channel at all. The evidence is that between Boush's Bluff lightship and buoy No. 10, four steamers, inward bound, three of them ocean steamships, passed this tug and tow starboard to starboard, without difficulty, each passing on the eastern side of the channel, the tow being at the time close to the western side, preparatory to making across the Roads for the Newport News flats. If, as stated by Pilot Cunningham, he considered this channel was only 100 feet wide, it readily accounts for the steamer's proceeding so closely to the western side of the channel, and therefore the greater endangering of a collision, and, if the Westhall kept within 50 feet of the buoys and within the center of a supposed 100-foot channel, the question of how this collision happened is an easy one to solve, and not necessarily inconsistent with her running aground. If the steamship was in the center of a 100-foot channel, and within 1,000 feet of a barge lying immediately across it, as this barge would have been (instead of at that distance from the center of a 500-foot channel), it but accentuates the necessity for her earlier starboarding, and shows why that maneuver was made too late by reason of the close proximity of the moving barge, which came in collision with the stem of the steamship still in motion, and which continued on her course across to the eastern side of the 500-foot channel, and grounded, leaving the injured barge still further to her starboard side and near to the buoy, where Capt. Bartlett said it was. In the judgment of the court this is the way the collision occurred, and is an entirely reasonable explanation of it. It places the fault upon the steamship, whether the channel was blockaded in part or in whole. If it was entirely blockaded, as contended for by the respondent, the master of the steamship should not have run his ship into a cul-de-sac. If the channel was blockaded only to the extent of 125 or 150 feet, there was ample

room to pass as others did, in perfect safety. Indeed, if the steamship had kept in the center of the channel, she could easily have passed, and, in no event, under the circumstances, should she have approached this incumbered vessel in such close proximity as not to have been able to avoid collision with it.

Counsel for the respondent insisted in argument that libelant should not recover because the tug and tow were on the wrong side of the channel. Under the circumstances of this case, the court cannot so hold, even conceding that the present rules of navigation as to the right of the road existed, and that the tug and tow should have kept to the eastern side of the channel. The court does not think that on that account the libelant should be disentitled to recover full damages. At the time the tug and tow crossed to the western side of the channel, and proceeded down from Boush's Bluff to a point near buoy No. 10, where they turned out of the channel, there was no obstruction in their way, and no reason either at the time they crossed to the western side of or at the time they moved out of the channel (whether it was upon the western or the eastern side of it) why they should not have taken the course they did to make the proposed anchorage. At the time the tug hauled out of the channel it was 1⅜ miles from the Westhall, in full view, in broad daylight, and at the regular place for leaving the channel to go where it was going, and had under the circumstances a perfect right to do what was contemplated, and there was neither danger therefrom or objection thereto to those in the proper discharge of their own duty. Certain it is, being on the western side of the channel at that time in no material way enhanced the danger of collision, and, instead, lessened the same. If it was necessary for the tow to cross to the western side of the channel, the sooner it did so the better, with a view of avoiding this collision; and the fact that it traveled along the western side from Boush's Bluff down to buoy No. 10 before turning out in no manner contributed to the collision. The fact of being on the wrong side of the channel of itself would not prevent a recovery in this case, as it would certainly not justify the steamship in violating her plain duty to keep out of the way, having the tug and tow in full sight, and being able to do so. The Saratoga (D. C.) 1 Fed. 730, 733; The America, 92 U. S. 438, 23 L. Ed. 724.

The Westhall on the occasion in question was the vessel on whom rested the burden to avoid the collision; and, she having been found guilty of faults sufficient in themselves to account for the collision, the burden is upon her to show that her negligence not only did not produce, but could not have contributed to, the collision, and under these circumstances she cannot escape liability by the suggestion of possible negligence on the part of the tug and tow. All reasonable doubts as to the vessel at fault must be resolved in favor of the tug and tow, and they held not contributing to the collision, unless their negligence is clearly established. The City of New York, 147 U. S. 73, 85, 13 Sup. Ct. 211, 37 L. Ed. 84; The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620; The Oregon, 158 U. S. 186, 197, 15 Sup. Ct. 804, 39 L. Ed. 943; The Delaware, 161 U. S. 459, 16

Sup. Ct. 516, 40 L. Ed. 771; The Portia, 64 Fed. 811, 12 C. C. A. 427; The Mexico (D. C.) 78 Fed. 653.

The court's conclusion is that the steamship is solely responsible for the collision, and a reference to a master may be had to compute the damages arising therefrom, unless· the same can be agreed upon.