## UNITED STATES v. GRANT et al.

(Circuit Court of Appeals, First Circuit. April 5, 1926.)

No. 1905.

**1. Collision ⬤═91.**

Vessel approaching another, which has disregarded signals, or whose position or movements are uncertain, must stop until course is ascertained.

**2. Collision ⬤═102—Failure of tug to stop and ascertain movements of ship, which had ignored signals, places on tug burden of proving that failure did not contribute to collision, and, on failure to do so, both vessels are at fault (Act June 7, 1897, c. 4, art. 18, rule 1 [Comp. St. § 7892]).**

Failure of tugboat to stop until having ascertained movements of steamer, which had disregarded signal, in violation of Act June 7, 1897, c. 4, art. 18, rule 1 (Comp. St. § 7892), places on tug burden of proving that such failure to stop did not contribute to collision, and, on failure to do so, both vessels are at fault.

Appeal from the District Court of the United States for the District of Massachusetts; James Arnold Lowell, Judge.

Libel by Robert Grant and others, trustees, against the United States. Decree for libelant, and the United States appeals. Decree modified.

George R. Farnum, of Boston, Mass. (Harold P. Williams, of Boston, Mass., on the brief), for the United States.

Foye M. Murphy, of Boston, Mass. (Blodgett, Jones, Burnham & Bingham, of Boston, Mass., on the brief), for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. This is an appeal from a decree of the District Court of Massachusetts, in admiralty. The libel arose out of a collision near the northerly end of Long Island, in Boston Harbor, on the night of December 13, 1922, between the steamboat General Thomas S. Jessup, of the Quartermaster Department of the United States, and the tugboat Juno, owned by the appellee.

While towing a barge from Quincy to Beverly, the Juno was summoned to the assistance of a British steamer, the Manchester Spinner, which had stranded upon the northwesterly side of Long Island. She left her tow at a wharf near Quincy Bridge to answer this call. She had proceeded up the harbor between Peddocks Island and Hull, and thence between Georges and Gallups Islands into the Narrows, and up the Narrows President Roads. She rounded can buoy 11 at Nixe's Mate, leaving it about 200 feet upon her port side, and set her course for can buoy 13, near the northwesterly end of Long Island. When half way between the two buoys, she sighted the Jessup, which was leaving the government wharf on the northwesterly side of Long Island.

The Jessup, after leaving the wharf, made a turn to starboard in the direction of can buoy 13, and headed toward Deer Island, nearly at right angles with the course of the Juno. The captain of the Juno was at the wheel, and the mate, who was with him in the pilot house, was able, with night glasses, to make out the Jessup as a government boat.

After the Jessup opened up her green light and cabin lights to the Juno, she began swinging to starboard around can buoy 13, as if to enter the channel between Long Island and Deer Island, known as President Roads, and to proceed upon a course nearly parallel to that of the Juno. The master of the Juno then signaled by two blasts of her whistle for a starboard to starboard passing.

The Juno, going to the assistance of the stranded vessel, was running at her full speed of 10 knots per hour, under a pressure, as testified by her engineer, of 125 pounds, while her maximum pressure was 135 pounds, and the tide was with her.

The Jessup did not answer the two blasts of the Juno, nor indicate, by one blast, a port to port passing, but, as Capt. Simpson of the tug testified, kept swinging toward the Juno, or in the direction in which she was running. The Juno did not slacken her speed or reverse her engines after she blew the two blasts, but as a collision seemed imminent the Jessup blew danger signals. The master of the Juno, in order to avoid a collision, if possible, attempted to starboard his helm and to swing the Juno to port; but, as her wheel was operated by hand gear, he was unable to change her course more than a point or a point and a half to port. In regard to this her master testified: "She don't turn very quick—pretty slow on the rudder with hand gear, going rapidly through the water as fast as she could."

The engines of the Jessup were reversed, but she struck the Juno upon her starboard side, nearly at right angles, and cut through to her boilers. The Juno was pushed toward the beach by the Jessup, where she grounded and sank.

The learned judge of the District Court has found that the Jessup was solely to blame for the collision. From this decree the United States, as owner of the Jessup, has appealed and assigned as errors that the court

erred in holding that the Jessup was solely at fault for the collision, and in not holding that the Juno was at fault; in holding that, under the circumstances, the Jessup was under obligation to blow one blast of its whistle; in failing to hold that the steam tug Juno should have kept the right-hand side of the channel in President Roads; in failing to hold that the steam tug Juno was at fault in going on at undiminished speed, without repeating her two-blast signal, if, as the libelant contends, a considerable period elapsed between her two-blast signal and the collision; failing to hold that the steam tug Juno was on the starboard bow of the Jessup, and should have held her course and speed; in failing to hold the steam tug Juno at fault for failure to sound danger signals; and in permitting the captain of the tug Juno to testify, over the objection of the respondent, subject to its exception, as to the alleged customary course of other vessels coming from the Narrows north and bound into or coming toward Long Island.

The collision occurred about 6 o'clock in the evening. There were no other vessels anchored or navigating the part of President Roads where this collision occurred. It was a starlight night, with no fog or mist, and each vessel had a clear and unobstructed view of the lights of the other.

The master of the Juno testified that he first saw the lights of the Jessup a little on his port bow as she was leaving the Long Island wharf, and that, as she headed toward Deer Island in the direction of can buoy 13, to which his course was directed, he saw her green light and her cabin lights, and then saw her swinging from port to starboard, as if to enter the channel of President Roads, along which the course of the Juno was laid. When he blew two blasts, to indicate a starboard to starboard passing, the Jessup was on his starboard side, but he testified that she kept "swinging, swinging, swinging toward him."

It is clear from the evidence that the Jessup was seeking to pass between the Juno and Long Island, but she had not indicated this intention by giving the signal required by the rules of one blast of her whistle to indicate a port to port passing, nor had she answered the two blasts of the Juno. She was primarily at fault for not having done so, as she was violating article 18, rule 1, of the Act of June 7, 1897, c. 4. See Comp. St. § 7892. We think that this violation on her part was not the sole cause of the collision, but that the Juno was also at fault for not having slackened her speed and reversed her engines, upon receiving no assent to the two blasts of her whistle, suggesting a starboard to starboard passing. No excuse is offered by her master for not doing so, although he testified he saw the Jessup swinging toward him and was uncertain what course she intended to take. He testified that, between the time the two blasts were blown by the Juno and the collision, two or three minutes elapsed, in which he was corroborated by the mate, who stood by his side in the pilot house. He admitted that he did nothing to check the speed of the Juno, but held his course and speed toward buoy 13 until collision was imminent, when he was only able to turn the Juno a point and a half to port from her course.

[1] We think the duty of the Juno, under these circumstances, is correctly stated in the opinion of the Circuit Court of Appeals for the Second Circuit in The Munaires, 1 F.(2d) 13, 15, where it is said:

"It has long been settled that, if a vessel is approaching another vessel which has disregarded her signals, or whose position or movements are uncertain, she is bound to stop until her course be ascertained for a certainty. The New York, 20 S. Ct. 67, 175 U. S. 187, 44 L. Ed. 126. A vessel which has signaled by two blasts that she intends passing to starboard instead of to port, and gets no assenting response, is in duty bound to stop, reverse, and, if necessary, come to a standstill, until the course of the other vessel has been ascertained with certainty, and the risk of collision removed. Chamberlain v. Ward, 21 How. 548, 16 L. Ed. 211; Border Line Transp. Co. v. Canadian Pac. Ry. Co. (D. C.) 262 F. 989."

See, also, The Albert Dumois, 20 S. Ct. 595, 177 U. S. 240, 44 L. Ed. 751; The Portia, 64 F. 811, 12 C. C. A. 427.

The master of the Juno testified: "I was a little late on the time, and I was trying to get there as quick as possible." The fact that the master of the Juno was attempting to reach the stranded vessel as quickly as possible, before high tide, no doubt caused him to violate this well-known rule, and to continue upon his course with unslacked speed, although he had received no assent to a starboard to starboard passing, and was in doubt as to the course upon which the Jessup would proceed after she had completed her turn.

[2] As the evidence is clear and convincing that the Juno failed to observe this rule, her failure to do so threw upon her the burden of proving that it did not contribute to the collision. This she has not done, and there-

fore we have reached the conclusion that both vessels were at fault.

The decree of the District Court is modified, so as to hold both vessels at fault, and appellant will recover costs in this court.