### THE MARTIN MULLEN.

### THE HERBERT K. OAKES.

(Circuit Court of Appeals, Sixth Circuit. October 7, 1919.)

Nos. 3285, 3286.

1. COLLISION ⊜83—STEAMERS MEETING IN FOG; EXCESSIVE SPEED.
     A collision on Lake Superior in a fog between meeting steamers *held* due to faults of both vessels; one being in fault for entering the fog at excessive speed and without a lookout, and for failing, as required by the rules, to reduce to mere steerageway on hearing fog signals somewhere ahead, and the other for excessive speed in the fog.

2. COLLISION ⊜153—REVIEW OF FINDINGS OF FACT.
     A finding by a District Court, which heard the witnesses, as to the speed of a steamer in a fog, will not be disturbed by the appellate court, unless the evidence decidedly preponderates against it.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. COLLISION ⬦⟹82(2)—EXCESSIVE SPEED IN FOG.

A speed of 8 miles an hour in a fog, made by a lake steamer on a frequented course, with the wind blowing from her toward any meeting vessel, *held* excessive.

Appeals from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in admiralty for collision by the Pioneer Steamship Company, owner of the steamer Martin Mullen, against the steamer Herbert K. Oakes, the Beaver Steamship Company, claimant, with cross-libel. Decree holding both vessels in fault, and both parties appeal. Affirmed.

Frederick L. Leckie and Lee C. Hinslea, both of Cleveland, Ohio, for Pioneer Steamship Co.

Harvey D. Goulder, of Cleveland, Ohio, for Beaver Steamship Co.

Before KNAPPEN and DENISON, Circuit Judges, and WESTENHAVER, District Judge.

KNAPPEN, Circuit Judge. On July 7, 1916, the steamer Martin Mullen, owned by the Pioneer Steamship Company, and the steamer H. K. Oakes, owned by the Beaver Steamship Company, collided in Lake Superior during a fog. The Mullen, which had left the Portage Canal at 3:18 p. m., was bound for Ashland, Wis., and was light. The Oakes was downbound from Ashland and was loaded. Upon a hearing on testimony in open court, the District Judge found both vessels at fault. The damages to the respective ships were stipulated and division made accordingly. Each party appeals.

The court found that on entering the fog each boat blew fog signals regularly as required by the rule (the wind, which was light, was from the Mullen to the Oakes, and perhaps for this reason the Mullen failed to hear the Oakes' fog signals, while the latter heard several from the Mullen); that on hearing these signals the Oakes' speed was checked to dead slow and a two-blast passing signal given, the wheel being immediately put hard astarboard. No response to this signal being received, the Oakes a little later blew a second two-blast passing signal, which was answered by like signal from the Mullen. On hearing the Mullen's passing signal, which indicated that that vessel was dangerously near and slightly to the starboard of dead ahead, the Oakes' engines were reversed and put full speed astern. It was found that at the time of the collision the Oakes was going three miles an hour.

The court found that the Mullen entered the fog at 6:30 p. m.; that she was then considerably to the north of her regular course (she being, however, absolved from fault on that account); that she was running at her full speed of 13 miles an hour when she saw the fog bank ahead and immediately checked to 8 miles; that after running for a short time in the fog, and before her speed was quite reduced to 8 miles, she heard a two-blast passing signal from the Oakes which bore about a point on the Mullen's starboard bow, which signal was promptly answered with two blasts and the wheel put hard astarboard;

that almost immediately thereafter the Oakes was seen in the fog, whereupon the Mullen's engines were put full speed astern—her speed being still about 8 miles, neither her course nor speed having been much affected by the starboard helm or engine reversal. It was found that the boats approached each other on courses nearly parallel, but slightly converging. They collided on their starboard bows at an angle of about one point.

The Oakes was found at fault (1) for not having a competent lookout on duty when approaching and entering the fog and in the lookout's failure to properly perform his duty while in the fog; (2) in entering the fog at full speed, instead of checking when the fog could have been seen, so as to enter at moderate speed; (3) in the maneuver made after the dangerous nearness of the Mullen appeared. The Mullen was found at fault in running in the fog at a speed of 8 miles an hour which the court held immoderate. She was otherwise relieved from fault.

[1] 1. *The Fault of the Oakes.*—We think the Oakes was rightly held guilty of fault contributing to the collision. In our opinion she ran through the fog at an immoderate speed within the meaning of rule 15 pertaining to navigation on the Great Lakes. She actually entered the fog at her full speed of 11 miles an hour. After entering the fog the Mullen's fog signals indicated to the Oakes that she was, at the most, not more than one or two points from right ahead. The Oakes did not at once reduce her speed to bare steerage way, as the rule required, but contented herself with making such check as would ultimately bring the speed to dead slow. She had apparently run at least five minutes under that check and had not yet reached bare steerageway before she reversed, and this she did only (as the court found) on hearing the Mullen's passing signal, which indicated her dangerous nearness. Whether the reverse was made a half minute before receiving this passing signal is not important. Danger meanwhile was the more to be apprehended from the fact that the Mullen had not replied to the Oakes' first passing signal. Had the Oakes been at moderate speed when she entered the fog, and later reduced to steerageway when the Mullen's fog signals were heard, the collision would probably have been avoided.

We also agree with the District Judge that the Oakes was at fault in her maneuver after hearing the Mullen's passing signal. As said by the trial judge:

"The wind was from the Mullen to the Oakes. The captain of the Oakes at the time suspected that the Mullen was failing to hear the whistles from the Oakes."

And we think it should have been evident to the Oakes that the two boats were rapidly approaching each other on converging courses. In our opinion there was then apparent ground for apprehension that a starboard to starboard passing was attended with danger, and that, instead of still insisting upon such passing, prudence required that the Mullen be advised of the situation by an alarm signal under rule 26. It seems, moreover, very plain that the backing of the Oakes at a time

when, as her master thought, the vessels were less than a half mile apart (and the distance was probably not much more than that), made the collision inevitable, for such backing, in spite of a faint suggestion to the contrary, would naturally cause the Oakes' bow to swing to starboard, and thus directly into collision.

The Oakes was also at fault, in our opinion, in respect of her lookout. The lookout (this was his first trip in that capacity) had not been on duty as such for several hours (being otherwise engaged), and was only called to his station as the fog was actually entered. There was testimony that such practice was not unusual in clear weather, and the weather was clear, except for occasional thick fog banks. However, the failure to have a lookout on duty at the least imposes a heavy burden on the Oakes of showing that his earlier presence at his post could not have prevented the collision. The George W. Roby (C. C. A. 6) 111 Fed. 601, 614, 49 C. C. A. 481. But as there is otherwise sufficient evidence of fault directly contributing to the collision we need not pursue this subject farther.

2. *As to the Fault of the Mullen.*—As already said, the trial court found that at the time of the collision the Mullen's speed was about 8 miles per hour. It was held that under the circumstances of this case an 8 miles speed was at least 2 miles in excess of moderate speed. Without finding it necessary to hold, as did the court below, that moderate speed in a fog can never be more than one-half of full speed, we have no difficulty in concluding that, under the peculiar circumstances of this case, the Mullen's speed was immoderate, if more than 5 to 6 miles at the outside, having regard to the density of the fog, the direction of the wind, which made it difficult (as the Mullen's navigator must have known) to hear for any great distance the fog and passing signals of approaching boats directly ahead, and the fact that she was sailing, in the height of the navigation season, in a much-frequented lane of Great Lakes commerce, where vessels were naturally to be expected. The Geo. W. Roby (C. C. A. 6) 111 Fed. 601, 608–610, 49 C. C. A. 481, and cases cited. She insists that her speed was no more than 3 or 4 miles an hour.

There was, however, testimony on the part of several of the Oakes' witnesses substantially tending to show that the Mullen's speed was fully as great as found by the court. The Oakes' master testified that he thought at the time and still thinks that the Mullen, when sighted shortly before the collision, "was going practically full speed. She carried the white foam in her mouth, and we heard the rush of the water under the bows plainly and distinctly before we saw her, and when she did get into view I believe she was from 800 to 1,000 feet away." The first mate, the boatswain, the wheelsman and the lookout all gave testimony of similar import. Mrs. Oakes, who was a passenger on the boat, said that "the thing that impressed me was the swishing sound made as it came right down on us and went past us in that same way." She says that the Mullen went "fast," and that "we all remarked about the boat's speed, and we remarked about her not turning around to come to us, because we of course expected that we would have to be taken off, and it seemed to be a long time before she

finally got around to us." The Mullen did in fact run past the Oakes, then turned around and came back alongside to inquire whether help was needed, and, receiving a negative answer, turned around again and started on her course.

The Mullen opposes to this evidence as to her apparent speed, not only the testimony of her own navigators of their own directions, as well as estimates of speed produced, but the testimony of her engineers, first, that on receiving the navigator's Chadbourne "slow" check 20 minutes before the collision the engine was throttled down to between 35 and 40 revolutions, and this engine speed retained until the reverse movement immediately before the collision; and, second, tending to show that such engine speed will actually result in ultimately checking the vessel's speed to between 3 and 4 miles per hour, and that before the Oakes was sighted her speed was so reduced. We think neither of these propositions so clearly established as to foreclose all substantial question of fact.

It is true that the engineer's log shows a check on account of fog at 6:30 p. m.; but it does not show whether the check was to slow speed or half speed, although it contains at 6:55 p. m. (5 minutes after the collision) the notation "ahead slow" and at 7:28 "full speed." It is also true that the engineer's log shows 1,200 revolutions between 6:30, when the check was given until the "ahead slow" at 6:55, and thus an average of 48 revolutions during the 25 minutes,[1] and counsel for the Mullen, allowing 22 minutes for the forward movement under check and 3 minutes for the reverse movement at 95 revolutions, make the average revolutions during the check about 40 per minute (it would be nearly 42); but no entry was made upon the log (after the fog check notation at 6:30) until 6:55; and the Mullen's engineer testified that she backed half to three-quarters of a minute before the collision. The period of reverse movement after the collision and before the actual entry was merely an estimate after the event. The engineer says he did not take the time he quit backing, but "should judge" he was backing "around about three minutes" and that he did not "figure these revolutions until we started and went ahead." The fact of reverse was never entered on the engineer's log, which also shows 45 revolutions per minute while under a 10-minute check passing through a fog bank about an hour before.[2] Had the engine (in the fog in which the collision occurred) proceeded under the ahead movement 19 minutes and under the reverse movement but 1 minute, the average revolutions during the 19 minutes would have been nearly 58, and if under the reverse 2 minutes an average of about 53 revolutions.

The proposition that a reduction of engine speed from 85 revolutions at full speed to 35 or 40 revolutions means an ultimate reduction of speed to between 3 and 4 miles is based upon the testimony of the Mullen's engineers, who say that to produce half and slow speed, respectively, they were in the habit of setting the throttle at certain

---

[1] The Mullen's chief engineer says 44 revolutions would give between 5 and 6 miles an hour.

[2] The engineer says that in the earlier fog he first checked to one-half speed for "about two minutes" and then to slow.

scratches on the quadrant placed there by a predecessor engineer; and the present engineers thought that the slow speed scratch meant about 35 to 40 revolutions, which they thought produced between 3 and 4 miles speed, and that 55 to 60 revolutions meant half speed through the water. But the engineers had never attempted an accurate testing out of these estimates. The chief engineer says the marking is not exact, and that he has never set his "throttle right dead on the mark." He could not show from his log that he had ever run as low as 35 revolutions in a fog. There was a lower check, called "half slow" which the engineer says "is practically the same as a stop; just enough to give her steerageway." It is not claimed that the speed was at any time on this occasion cut to "half slow."

Counsel for the Oakes cite certain standard works on navigation to the effect that, but for the so-called "slip," due to the instability of water, there is theoretically an exact ratio between engine revolutions and speed of boat, and that in the ordinary reciprocating engine propeller the higher the speed the greater the slip, and thus that the speed produced at lower rates of revolution is not less, but greater than the actual ratio of revolutions. Disregarding slip, 45 revolutions of the Mullen's engines would theoretically produce a speed of nearly 7 miles.[3] The Mullen's counsel stoutly challenge this rule as applied to the shallow draft and bluff bow construction of lake vessels, as compared with the deeper draft and sharper bows of sea-going vessels. The record here is not such as to enable an accurate determination of the actual relation between engine revolutions and speed through the water as applied to the Mullen, and the estimates of her engineers are consistent with the testimony of the Oakes' engineer as applied to that boat —each boat being, however, equally interested in cutting down its own speed; and if it is true (as the Mullen insists) that Judge Tuttle's conclusion of the Mullen's speed rested necessarily on the proposition that 45 engine revolutions meant 8 miles an hour through the water, we should find it difficult, if not impossible, to sustain it as this record stands.

[3] As indicating the lack of certainty of the engineers' estimates: The second engineer says at one time "I *don't think* it would go over 4 miles an hour between 35 and 40." The chief engineer, in answer to a question whether, if the engine speed was 86 and it was checked to 43, the speed would still be more than half speed, said: "Well, for the first little while it would be, but gradually coming down, after the boat got down to where she would answer for the turns of the engine, *I would judge* that it would be less than half speed." The second engineer, after saying that he did not think that when somewhere near full speed was reached the increase in speed through the water would be as great as the increase in revolutions, in answer to a question by the court, "Then does it not of necessity follow the other way back, as you decrease the speed of your engine, you do not decrease the speed of your boat as much as you decrease your engine, do you?" said. "Well, I could not say;" and in answer to further question by the court, "Whether or not when you increase the speed of your engine, making it twice or three times as much, whether you have made your march through the water twice or three times as much, or whether it falls below that, or what?" said, "I don't know;" and in answer to a further question, "And I take it the answer would be the same when you decrease the speed?" said, "I don't think I would be able to tell you about that." (All italics in this opinion ours.)

But we do not interpret his opinion as necessarily meaning that he would not have found the Mullen's speed as he did, but for the proposition that 45 engine revolutions produced 8 miles boat speed, notwithstanding the statement that in her course through the fog "the Mullen checked her engines from 85 revolutions, which was full speed, down to 45 revolutions, which would be a speed of 8 miles an hour through the water after losing her full speed momentum," and in spite of his statement on the trial that the testimony given in this case is "just the opposite of every case I have ever heard on the subject. They have all testified before that at full speed, whatever it is, if your engine is cut to half, you don't lose half speed, you get about two-thirds"—which latter statement is criticized by the Mullen's counsel as indicating confusion between one-half speed, as indicated by the Chadbourne (said to mean in practice from one-half to two-thirds boat speed) and engine speed indicated by revolutions. We understand the judge to reach his conclusion as to the Mullen's speed by taking into account the entire situation. Judge Tuttle said:

"The witnesses for the Oakes nearly all say they observed the water ahead of the Mullen, and they tell me about hearing the noise from the Mullen, and it does not seem that all of them could have confused it with the noise of their own ship. I have taken that into account; I have taken into account the log of the Mullen, the testimony from the Mullen, and the entire situation the best I can. I have tried to figure out the revolutions of the Mullen's engines while in this fog. They seem to be about what they usually were when she was in a fog. The problem is complicated by the fact that the Mullen's engine revolutions were not recorded from the time she checked until she was stopped after working full speed astern. Her usual check in a fog seems to have been to 8 miles on hour, *and everything in the case considered* I conclude that her speed was 8 miles in this fog. The witnesses have not been able to give me any reliable opinions as to speed through the water at given revolutions of the engine."

[2] This conclusion we are bound to accept, unless the evidence decidedly preponderates against it. City of Cleveland v. Chisholm (C. C. A. 6) 90 Fed. 431, 434, 33 C. C. A. 157; Monongahela Co. v. Schinnerer (C. C. A. 6) 196 Fed. 375, 379, 117 C. C. A. 193. Upon a careful consideration of the record, and giving due regard to Judge Tuttle's familiarity with navigation on the Great Lakes, we are certainly unable to say that the evidence decidedly preponderates against the conclusion that the Mullen's speed substantially exceeded 5 to 6 miles an hour.

We may add that the short time which elapsed between the Mullen's passing signal and the meeting of the boats tends to corroborate the court's conclusion as to the Mullen's speed.

[3] We may also add that, while the conclusion below that the Mullen was at fault was reached with announced reluctance, Judge Tuttle's doubt was not as to the Mullen's actual speed, but as to whether the speed found was immoderate; on this latter question we have no doubt.

But, assuming that the Mullen's speed was not immoderate up to the time the Oakes' passing signal was heard (although we are disposed to think she should long before have taken steps to reduce to bare steerageway), we think the Mullen plainly at fault in making the passing

agreement. The Oakes was completely hidden from view by the fog. But one signal was heard, and the master was unable to locate very definitely the direction of the sound. The best he could say was that the whistle bore from him "just a little on the starboard bow as near as I could tell, only hearing it once." At the most, he got no very clear impression as to the distance of the approaching boat. As he says:

"It was pretty hard to tell, only hearing the whistle once to locate it. You could not tell exactly how far it was off. * * * Probably it sounded half a mile, probably more, I could not say definitely."

He thought "somewhere around" half a mile. He says that not over a minute elapsed from the time he answered the passing signal until he saw the Oakes in the fog, not more than 500 or 600 feet away. The difficulty of accurately locating the direction of sound in a fog, especially from hearing but one signal, is well known. The Oakes was then, as it appeared to the Mullen's master, close at hand and nearly right ahead. If both vessels were going at the speed they respectively claim, and continued on those courses, they would meet in about four minutes. In this emergency we think the Mullen should have sounded an alarm and done her best to stop. The Geo. W. Roby, supra, 111 Fed. at pages 608-610, 49 C. C. A. 481, and cases cited. Had this been done, and especially had her previous speed been no greater than claimed by her, it is not unlikely that the collision would have been avoided.

It results that the decree of the District Court should be affirmed.

