164 F.Supp. 421 (1958)
PARTENREEDEREI WALLSCHIFF owner of THE M/V WALLSCHIFF, Libelant,
v.
THE Steamer PIONEER, her engines, etc.,
and
The Cleveland-Cliffs Iron Co., owner of the Steamer Pioneer, Respondents.
The Cleveland-Cliffs Iron Co., as chartered owner and operator of the Steamer Pioneer, Cross-libelant,
and
M/V Wallschiff, her engines, etc., Cross-respondent.
AMERICAN SEATING COMPANY et al., Libelants,
v.
THE Steamer PIONEER, her engines, etc., Respondents.
Nos. 13101, 13549.
United States District Court E. D. Michigan, S. D.
May 21, 1958.
*422 Foster, Meadows & Ballard, Detroit, Mich., Haight, Deming, Gardner, Poor & Havens, New York City, for Partenreederei Wallschiff and others.
Hill, Lewis, Andrews, Granse & Adams, Detroit, Mich., for American Seating Co. and others.
McCreary, Hinslea & Ray, Cleveland, Ohio, and Watson, Lott & Wunsch, Detroit, Mich., for respondents.
O'SULLIVAN, District Judge.
On October 2, 1953, at about 11:00 P.M., a German motorship, the Wallschiff, and the Steamer Pioneer came into collision on the Canadian side of the St. Clair River, opposite the City of Port Huron, Michigan. Both ships were damaged, and the Wallschiff was sunk.
The Pioneer, a conventional Great Lakes ore carrier, with an overall length of five hundred feet and a cargo of nine thousand tons of iron ore, was downbound in the river. The Wallschiff, with an overall length of two hundred and five feet and a gross tonnage of eight hundred and eighty-eight tons was upbound on her maiden voyage through the St. Clair river. Captain Timothy O'Leary, sixty-three years old, was master of the Pioneer and had sailed the Great Lakes for approximately forty-three years. He obtained his pilot's license in 1921 and his master's license in 1925 or 1926. He had been in command of Great Lakes vessels for about thirteen years prior to the occurrence involved here. Other members of the Pioneer's crew who were sworn as witnesses were for the most part experienced sailors. The Wallschiff crew consisted of Captain Harold Patterson, designated Sailing Master or Pilot, who came on board at Kingston, Ontario. Captain Patterson, seventy-three years of age, was a retired Canadian Great Lakes Captain. The members of the crew were German nationals of varying ages, but relatively young on the average. The wheelsman on duty at the time was fifteen years of age with a few months of experience as a sailor. None of the crew of the Wallschiff, except the Canadian pilot, had ever been in the St. Clair river previous to the night of the collision. The collision occurred some time around 11:00 P.M. The Canadian pilot died during the events involved in the collision. The cause of his death was given as coronary thrombosis (with death occurring immediately at its onset) with an additional contributing cause specified in the death certificate as, "exertion anxiety was aboard ship in collision". Only two of the German crew spoke English. Orders of the Canadian pilot, given in English, were translated by the Wallschiff's captain and transmitted in German to the respective members of the crew.
The crews of the respective vessels gave accounts of the collision which were in sharp dispute. Members of the Wallschiff crew, whose depositions were taken before their return to Germany, testified that the Wallschiff was proceeding upstream and had received a one-blast passing signal from the downbound Pioneer, which they construed to indicate the Pioneer's election of a port-to-port passage. The Wallschiff's captain, supported by some members of his crew, testified that he replied to the signal with one blast, and in conformity therewith, directed his boat to accomplish a port-to-port passage; that shortly before the collision, the Pioneer suddenly changed its course from starboard sharply to port and was heading for the Canadian shore; that the Wallschiff, then also proceeding toward the Canadian shore, vainly tried to avoid collision by reversing its engines and going hard to starboard, but was rammed by the Pioneer.
The Pioneer's crew, supported by a substantial number of disinterested witnesses, gave a strikingly contrary account of the events which preceded the collision. When still above the Blue Water Bridge, Captain O'Leary, master of the Pioneer, saw a green light blink out on a boat that appeared to be bedding down at the Water Works dock on the Port Huron shore of the river. This would be a considerable distance south, or downstream. He intimated that this light was probably on the Wallschiff. *423 His first certain view of the Wallschiff was when he was about one-half mile from it. It was then coming upstream close to the American shore, approximately one hundred feet therefrom, and in such a position that he considered a port-to-port passing, which was usual in that part of the river, impracticable. He gave a two-blast signal, exercising his right of election as the down-bound boat to choose a starboard-to-starboard passing, and directed his course to port. His first signal was unanswered by the Wallschiff and after a thirty second interval, he gave a danger signal followed by a second two-blast. During this time the Wallschiff continued on a parallel course close to the American shore, and the Pioneer continued on a port course, but all of its signals remained unanswered. After the second two-blast signal, the Wallschiff suddenly changed its course to starboard and proceeded at about a forty-five degree angle directly across the course of the Pioneer, in such a manner as to make it impossible for the Pioneer to avoid it. The collision occurred somewhere south of midstream in Canadian waters.
After the collision, the Pioneer kept its bow in the side of the Wallschiff to prevent it from sinking in midstream, and pushed it toward the Canadian shore. Contact was broken shortly before the Wallschiff sank, close to the Canadian shore.
This Court's conclusions as to which of these accounts is the truth will be discussed hereinafter.
This action was commenced by the Partenreederei Wallschiff, owner of the Wallschiff, against the Pioneer and its owner, the Cleveland Cliffs Iron Company. The parties will hereinafter be referred to as the Pioneer and the Wallschiff. A cross libel was filed by the Pioneer against the Wallschiff. A second action was commenced by the American Seating Company and its underwriters against the Pioneer for loss of the Wallschiff's cargo, owned by the Seating Company. Trial was had to determine liability, it being suggested by counsel for all parties that when liability became fixed, the matter of the amount of damages involved could probably be agreed upon. No evidence was introduced on the question of extent of damages. Both ships, however, were damaged in the collision and the cargo of the Wallschiff was either lost or damaged. Pleadings asserted that the Wallschiff's damages amounted to $500,000; the Pioneer's damage was alleged to be $50,000, and the cargo loss was put at $50,000.
At the conclusion of proofs, all parties conceded that the collision occurred in Canadian waters, and that liability should be determined in accordance with the Canada Shipping Act of 1934, Section 640, Chapter 44, and the Brussels Convention of 1910. Counsel likewise conceded that on the questions of due care and negligence and the applicable Rules of Navigation, the law of Canada is substantially the same as the law of the United States. It was recognized, also, that if the Court should find mutual liability, damages would be apportioned according to the above Canadian law and the Brussels Convention.
The Court is satisfied from all of the evidence that the principal and major fault in this case was that of the Wallschiff. Aside from the weight, or lack of it, which this Court finds in the conflicting evidence of the members of the respective crews, the Court is greatly helped by the testimony of disinterested eyewitnesses along the Michigan shore who had an opportunity to observe the movement of the boats in question and to hear the signals given during the time the boats were approaching each other prior to and at the time of the collision. Not all of the outside witnesses corroborated the testimony of the crew of the Pioneer. A witness who was on the porch of the Westcott Marine Reporter Station on the Port Huron shore, and a witness who was on the Canadian shore gave testimony which tended to support the account of the crew of the German boat. The Court is satisfied, however, that the record will fully justify his conclusion that they lacked sufficient credibility *424 to seriously detract from the weight the Court is giving to the other disinterested witnesses. There are discrepancies as to time, distances and other details between the account of the various disinterested witnesses produced by the Pioneer, but in the main, their testimony heavily supports the broad picture of the events as given by the members of the crew of the Pioneer and its master. From testimony in the case, the Court finds the following facts:
1) At a time when the Pioneer was over one-half mile upstream from the Wallschiff, the Pioneer's master observed the Wallschiff coming upstream close to and about one hundred feet from the American shore. Observing the Wallschiff's position, the downbound Pioneer exercised its right of election to make a starboard-to-starboard passage. The Court finds that Captain O'Leary was justified in his conclusion that in view of the then position of the Wallschiff, it would be more practical and safer to go to port rather than to come in close to the American shore to pass; that while still better than one-half mile away, the captain sounded a two-blast passing signal. The Pioneer got no response from the Wallschiff, but the Wallschiff continued its parallel course along the American shore.
2) After the lapse of about thirty seconds following the first two-blast signal, receiving no response from the Wallschiff, the Pioneer blew a danger signal for the purpose, as its captain said, of alerting or waking up the master of the Wallschiff. No response was then received from the Wallschiff and the danger signal was followed by a second two-blast signal. Following, or at about the time of, the second two-blast signal the Wallschiff suddenly swung to starboard and headed across the river at about a forty-five degree angle. At that time, about twelve hundred feet separated the boats. The Pioneer had been continuing its course to port and when the Wallschiff changed its course, swung hard over to port.
3) The Pioneer did not reduce its speed, reverse its engines or change its wheel from port until it was approximately two hundred feet from the Wallschiff, at which time the wheel was put amidships and the engines were reversed. This, however, made no appreciable change in the direction or speed of the Pioneer and it struck the Wallschiff aft of midship, the angle of the collision being approximately ninety degrees. The speed of the Pioneer was about eleven and one-half miles an hour, the down current about five miles an hour, and the Wallschiff was moving about eight miles an hour against the current.
In weighing the evidence of the members of the crew of the Wallschiff against the evidence opposed to it, including the evidence of disinterested witnesses, the Court has taken into consideration the following things disclosed by what was said in the depositions of the members of the Wallschiff crew.
At the time of the occurrence, neither the wheelsman, Schulz, nor a sailor who was standing watch at the time could understand a command given in English. Any command made by Captain Patterson was in English. Any directions given by Captain Patterson would be given in English and then translated either by the master, Thomas Nissen, or the mate of the Wallschiff. The first time the master of the Wallschiff saw the Pioneer was when the ships were a quarter of a mile apart, with the Pioneer showing a red, or port, running light. He stated that later the red port light of the Pioneer disappeared; he then saw its green light, indicating that the Pioneer had changed course. While not certain of the distance, he indicated that this happened when the boats were two or three hundred feet apart. He said he sounded a three-blast signal when the boats were from fifty to one hundred feet apart. At that time he put his engines full speed astern and the wheel hard right. The Wallschiff's master testified that when he first heard a one-blast signal *425 from the Pioneer, the Wallschiff was heading on a light on the American side. He said it was the light that was the most far to the American side, a light on the Blue Water bridge. He had never approached the Blue Water bridge before.
The third mate of the Wallschiff was Herman Vahsling. He was on watch at the time of the occurrence in question. He testified that just before the vessels collided, the captain ordered him to go into the chart room to get a new chart; the one up to then in use was run off and they needed a new chart. Apparently, he was working on getting this new chart, and perhaps had completed it when the collision occurred. He did not hear any signals given, either by his own boat or the Pioneer. He testified that the pilot, Captain Patterson, was standing on the bridge when he left to go to the chart room, but when he returned the pilot was gone and he never saw him again. There is some uncertainty in this witness' testimony as to the changing of the chart, and whether the pilot and captain had examined the new one prior to the collision. They would have to go from the bridge into a separate and enclosed room to study the chart.
The machinist's assistant, Manfried Lohrbeer, was standing watch with the first engineer, at the time of the collision. He was twenty-one years old. Prior to this he had sailed about six months and had been on the Wallschiff a little over a month. Heinz Werner Schulz, who was acting as wheelsman on the Wallschiff at the time of the collision, was fifteen years old and had been sailing about five months. The Wallschiff was the first boat he had ever sailed on. His ordinary duties were cleaning in the mess hall, painting, sweeping and sometimes acting as wheelsman. At the time of the events involved here he was acting as lookout and was steering the vessel. When asked whether he remembered any whistles from the Wallschiff just before the collision, he stated he could not say for sure, he had heard several but could not say where they came from. Orders from the pilot to the captain were translated by the captain and then given to the wheelsman. He did recall an order to put the wheel hard starboard, just before the collision. When asked if he had seen any lights ahead just before the collision, he said he saw a lot of lights ahead. He was asked whether at any time he heard Klein report to the captain that any other vessel was anywhere around, he said he did not; and he did not hear the captain say anything about the presence of any other vessel. He did not say that he heard nothing, but merely that he couldn't listen to someone else while he was steering. He discussed various lights he had seen as they were coming up the river, approaching the scene of the collision. He stated that he steered according to orders received from the captain and upon being asked whether the pilot or the captain pointed out the particular light on which he would steer, he stated he selected the light himself. He stated he did not see the Pioneer at any time before the collision; that he did not see the Pioneer even immediately before it came into the side of the Wallschiff.
The witness Hans Klein was acting as lookout at the time of the collision. He was twenty-seven years old. He testified he heard signals from the Pioneer, but described them as one-blast signals. He testified he saw lights of the approaching Pioneer; that he first saw a red light and then a few white lights, then he heard one short blast. He described the Pioneer as turning very slowly toward them, and as the Pioneer came close, he noticed for a short time red and green lights. As it came closer, he noticed only green lights. He described the Pioneer's turn to port as at first very slowly, then as he noticed the red and green lights, the turn was faster. He could not tell how long he could see the red light of the Pioneer after he first saw it. His station was on the port side and he would have to look across the ship to see the lights on the right-hand side. He stated there were white lights all along the length of the Pioneer. He could not say how far away the Pioneer was when he *426 first saw it, he said he would have to guess, it was not close at the beginning. He stated he first saw the red light on the Pioneer and he continued to see it for several minutes, but was not sure of the time. He said, "I saw the red light and then the white lights which became shorter and shorter all of the time, which would indicate that it was swinging." He testified that when he first noticed the Pioneer and heard the one-blast signal, the captain immediately ran inside and answered with a one-blast signal. He stated he did not give a report to the master when he first saw the Pioneer and heard the whistle. Asked if he made any report to the master when he saw the Pioneer, or if he discussed the general situation from that time to the collision, he stated, "I cursed like the dickens when I noticed him coming so close. That's all I did."
There is confusion in the testimony as to the action of the Wallschiff's Canadian pilot. He was seen to fall down at or about the time of the collision. The captain of the Wallschiff stated that the Canadian pilot had given the order to answer the original one-blast signal, and at the same time ordered the wheelsman to go easy starboard. This was, however, before the green light was seen indicating the claimed change in the course of the Pioneer. After this change of course by the Pioneer, the pilot apparently took no part in the navigation of the ship and, presumably, the captain was in command after that. The pilot died from a heart attack. Counsel for the Pioneer urged the Court to attach significance to the manner and time of his death, as bearing upon the conduct of the Wallschiff. This Court, however, finds it unnecessary to do so, and believes it would be unsafe to speculate on the subject. However, a fair reading of the testimony of the Wallschiff crew strongly suggests the existence of some degree of confusion on the Wallschiff at the time of its approach to, and attempted passing of, the Pioneer.
Witnesses, not members of the crew, presumably disinterested, corroborated the testimony of the master of the Pioneer that the Wallschiff was coming upstream close to the American shore and about one hundred feet therefrom. They described the Pioneer coming under the Blue Water bridge, pretty well in the center of the river. They corroborated the master of the Pioneer as to the location of his boat and the Wallschiff and as to the giving of signals.
These witnesses and their location at the time of the events involved were as follows: George Ashton, an employee of the City of Port Huron, was standing in the door of the pump house at the Port Huron Water Works, and observed the Wallschiff pass close to the Water Works dock. John C. Diller, who had served eight years in the Navy, on the night of the casualty was on the porch of the Westcott Marine Reporting office on the river bank and had a very clear view of the scene of the accident. George E. Cray, whose home was on the river bank, near the Westcott Marine Reporting office, likewise had a rather clear view of the river and described the events of the collision. Thomas E. Robinson was an employee of the Peerless Cement Company which is on the St. Clair River just below the Blue Water bridge. He observed the action of the Pioneer and Wallschiff at various times as they approached the collision. Mr. and Mrs. Wilson Montgomery observed the Wallschiff from their home which was close to the river bank. Their home was some distance below the Port Huron Water Works Park. They were concerned for their sail boat, which was moored opposite their house, when the Wallschiff went by very close to shore.
There are discrepancies between the witnesses as to the lights on the Wallschiff. The master of the Pioneer testified he did not see any running lights on the Wallschiff, although some members of the crew indicated that they did. Another witness saw only its range lights, that are on the fore and aft mast. As to the distance the Pioneer was when they blew the first blast, there are varying statements of its location at that *427 time, but they all did indicate that the Pioneer was coming under, or coming out from under, the Blue Water bridge. This would corroborate the master's testimony that he was more than one-half mile away from the Wallschiff when he blew his first passing signal. On cross-examination, the attention of the Pioneer's master was called to some marks he had, at the Coast Guard investigation, placed on a chart to indicate the location of his boat and the Wallschiff at the time of giving the signal. Scaling these would indicate a distance less than one-half mile, or approximately twenty-three hundred feet. The Court is not impressed that these marks should conclusively control his estimate or seriously detract from the weight of the testimony of the captain.
This collision occurred at night, the events occurred rapidly and the Court would be surprised if there were not discrepancies between the accounts given by various witnesses whose opportunities to observe were from different vantage points, and whose recollections contained the variances which always occur in human memories. The Court finds that the collision was caused primarily by the conduct of the Wallschiff. Its action in turning suddenly to cross the river was described by various witnesses as a "sheer" and expert testimony was given to indicate that this could have been brought about by the action of the boat being too close to the shore, causing it to sheer sharply into the river. This was referred to as shore suction. Whatever may have been the true situation aboard the Wallschiff, the Court is satisfied that it was not being navigated with the care that the situation at hand called for.
One thing is quite significant. The master of the Wallschiff testified that his boat was coming upstream on the Canadian side of the river. This is directly contrary to the testimony of the disinterested witnesses, referred to above, and indicates that the master of the Wallschiff was not aware of where he really was as he approached the Pioneer.
The Court, however, must now proceed to determine whether or not the Pioneer's master was guilty of some infraction of the rules of navigation which in any degree contributed to the collision from which this litigation arises. There was considerable testimony about what the members of the crew of the Pioneer saw or did not see prior to the time its master observed the location of the Wallschiff and gave a two-blast signal. It is not important to review this evidence because the Court finds that the evidence clearly establishes that at a time when the Pioneer was slightly more than one-half mile away from the Wallschiff, its master was aware of the presence and the location of the Wallschiff in the river. There was then ample time for a perfectly safe and normal passage if both boats obeyed the rules of navigation. From the time the Pioneer observed the Wallschiff until the time of its sudden and inexcusable sheering across the river, the Pioneer was proceeding normally, pursuant to its election to make a starboard-to-starboard passage. The collision could not have occurred had the Wallschiff continued on the course it was proceeding on when it first received the two-blast passing signal and had it given any heed to such signal, to the danger signal or to the second two-blast signal. In addition to the signal, which it must be charged with having heard, the Wallschiff was in no way prevented from seeing the larger boat, the Pioneer, with its mast lights, running lights, and long string of deck lights, that are peculiar to the Great Lakes ore carriers. No satisfactory explanation was given by any of the libelant's witnesses for their failure to have made a clear and timely observation of the Pioneer. The fault, therefore, of the Wallschiff was grave and inexcusable.
A more difficult question, however, is presented by the charge that notwithstanding the negligence of the Wallschiff, the Pioneer's master was guilty of a statutory violation which should be held to have contributed, in some degree, to the casualty.
*428 It has been assumed by both counsel that the Rules of Navigation of the Great Lakes as found in the United States Code Annotated, and the Great Lakes Pilot Rules (libelant's Exhibit 3) apply to the conduct of both vessels and that in any event, the laws of Canada and its regulations are identical with the mentioned American rules.
Rule 24 (33 U.S.C.A. § 289) provides:
"In all narrow channels where there is a current, and in the rivers * * * St. Clair * * * when two steamers are meeting, the descending steamer shall have the right-of-way, and shall, before the vessels shall have arrived within a distance of one-half mile of each other, give the necessary signal to indicate which side she elects to take."
The Pioneer had this right of election and, as the Court finds, properly exercised it.
Rule 26 (33 U.S.C.A. § 291) provides:
"If the Pilot of a steam vessel to which a passing signal is sounded deems it unsafe to accept and assent to said signal, he shall not sound a cross signal; but in that case, and in every case where the pilot of one steamer fails to understand the course or intention of an approaching steamer, whether from signals being given or answered erroneously, or from other causes, the Pilot of such steamer so receiving the first passing signal, or the pilot so in doubt, shall sound several short and rapid blasts of the whistle; and if the vessels shall have approached within half a mile of each other both shall reduce their speed to bare steerageway, and, if necessary, stop and reverse."
If the Pioneer's master was in doubt, or should have been in doubt, as to the course or intention of the approaching Wallschiff, at any time when he still could have, by effective compliance with the foregoing rule, avoided the collision, he should have done what the rule requires to be done; and his failure so to do must charge him with some share, however slight, of the responsibility for its happening.
Captain O'Leary testified that when more than one-half mile away from the Wallschiff, he sounded his two-blast signal. He testified that he got no response to such signal. He then waited for thirty seconds during which time he remained on his port course and continued at full speed. After this wait without responsive signal, he blew a danger signal for the purpose, as he testified, of "waking up" the master of the Wallschiff. There was still no response from the Wallschiff, and it continued on its course parallel with the American side. O'Leary then sounded a second two-blast signal, still continuing, however, at full speed; at this juncture, the Wallschiff made its abrupt swing and headed across the Pioneer's bow. The Pioneer's master then went hard to port and continued his speed, believing such was the safest action to take. When he was within two hundred feet of the Wallschiff, he reversed his engines and put his wheel amidships. This Court does not believe that there was any negligence or fault in what the master of the Pioneer did, or failed to do, from the time that the Wallschiff started its abrupt course to its starboard, even though upon reflection he or others might conclude that some other method would have been a better course. Neither does the Court find contributory fault in the failure of the Pioneer to drop its anchors. From the Court's own impressions as to the function of anchors, and from opinions expressed at the trial by veteran mariners, the Court's conclusion is that good seamanship would not have been served by dropping the Pioneer's anchors in the fast moving events which preceded the collision.
This Court, however, is of the opinion that the silence of the Wallschiff upon receiving the first two-blast signal from the Pioneer should have placed the master of the Pioneer in some doubt. It was not necessary for him to immediately *429 upon failure to get a responsive signal, reverse his engines and reduce his speed. It cannot be said with mathematical nicety how many seconds a captain should wait for an answering signal. Thirty seconds, however, without action, followed by a danger signal, still without action and without full assurance of a safe passage, persuades this Court that he cannot completely exonerate Captain O'Leary of fault. The speed at which the distance between the boats was being shortened was likewise reducing the opportunity of the captain to meet the emergency, however sudden, which did, indeed arise.
It is true that he testified that he was not alarmed at the lack of responsive signal because the Wallschiff was continuing on a course that would have permitted safe passage. However, some doubt is evidenced by the fact of his blowing a danger signal, and his desire to "wake up" the Wallschiff's pilot. By so doing, he did indicate concern that the Wallschiff's master was confused or inattentive. The Court cannot say that if the master of the Pioneer had been earlier concerned and had taken steps to reduce the speed of his vessel, the collision would nevertheless have occurred.
Experienced lake captains gave expert testimony concerning the conduct of the master of the Pioneer and expressed their belief that what he did was in keeping with good seamanship and that in like circumstances, they would probably have done as he did. The Court was impressed with the truthfulness and the sincerity of these old time mariners. However, the Rules of Navigation are rules of conduct, distilled no doubt from the experience and judgment of those who have sailed the inland and ocean waters through the years of modern navigation. Believing that a described course of conduct gives strong assurance of safety under given circumstances, such conduct has been enjoined on all by rules of law. It is not for a master, or for experts, to say that in certain circumstances it is good seamanship to disregard these rules.
The rule enunciated in The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126, is applicable to the conduct of the master of the Pioneer in the case at bar. In that case, the steamer Conemaugh had given a signal indicating the course she intended to follow. No reply came from the approaching steamer New York. At a time when these boats were still three-quarters of a mile apart, a second blast went unanswered. A third signal was given. The Supreme Court, in finding fault on the part of the Conemaugh, said, 175 U.S. at page 201, 20 S.Ct. at page 72:
"The New York made no answer to this third signal. The duty of the Conemaugh at this juncture was plain. She should have stopped her engines after the second signal, and, if necessary to bring her to a complete standstill, have reversed them. Nothing is better settled than that, if a steamer be approaching another vessel which has disregarded her signals, or whose position or movements are uncertain, she is bound to stop until her course be ascertained with certainty."
It might be contended that the above case is distinguishable because of the repeated signals that were unanswered. However, the rules involved do not specify the number of signals that shall be given. On the evidence before it, this Court cannot say that had the master of the Pioneer reduced the speed of his ship at the time when he should have been in doubt as to the Wallschiff's course, that this collision would nevertheless have occurred or that the collision would have been as severe as it was.
No doubt in the everyday handling of boats, masters of vessels wait the interval that Captain O'Leary waited in this instance without untoward results. When, however, disaster does follow, we must look to see whether or not a rule should have been observed and whether failure of its observance contributed to a collision.
*430 In the case of A. H. Bull S.S. Co. v. United States, 2 Cir., 34 F.2d 614, at page 616, there is discussed the duty of a master to begin promptly his action upon failure of a responding signal:
"But her duty began before. Her signal had not been answered, and she could not in the nature of things know what the Chinook proposed to do. Under such circumstances a master is bound to stop his way, * * * There is no more important rule, since vessels, though not quite dead, will so reduce their speed that the collision, if it occurs, will be insignificant, as certainly would have been the case here. Had the Clare done her duty shortly after her first signalthat is, as soon as she was in doubt as to the Chinook's navigation this collision would not have happened. If she had done it as soon as the Chinook began to swing upon her course, it probably would not have happened. * * * masters who choose to divine the purposes of other vessels and keep on, may avoid the charge of overcaution, but they take their chances." See also United States v. Grant, 1 Cir., 11 F.2d 700: The Munaires, 1 Cir., 1 F.2d 13.
This Court is not impressed, however, that the Pioneer's fault was at all of the character or gravity of that of the Wallschiff, but it cannot be eliminated entirely. Some Court might find that the Pioneer's fault was so minimal and the Wallschiff's so gross as to cast the entire burden of fault upon the Wallschiff. With the opportunity here to apportion damages, this Court does not feel that it should do so. It is, accordingly, this Court's opinion that negligence of the libelant and the libelee should be apportioned, and the Court finds that the Pioneer should be, and is, charged with five percent of the negligence and the Wallschiff with ninety-five percent thereof. Damages, when they are ascertained, shall be apportioned accordingly.
If the American rule had to be applied in this case, with equal division of the damages, this Court might, indeed, imitate many of its predecessors and seek to avoid injustice by excusing the Pioneer under the major-minor fault doctrine. Being constrained to find that there was some violation of Rule 26, supra, by the Pioneer's master, this Court is grateful for the circumstances that this collision happened in Canadian waters.
The Court assumes that if the parties can agree upon the amount of damages, an appropriate decree may be entered in conformance with this opinion. If agreement cannot be reached as to damages, testimony on this question will be taken either by this Court or by its commissioner.