**FEDERAL INSURANCE COMPANY, et al., Libelants-Appellants,**

**v.**

**S.S. ROYALTON, her engines, etc., and Scott Misener Steamships, Ltd., Respondents-Appellees.**

**Christoforos MANOPOULOS et al., Libelants-Appellants,**

**v.**

**S.S. ROYALTON, her engines, etc., and Scott Misener Steamships, Ltd., Respondents-Appellees.**

**Nos. 14745, 14760.**

United States Court of Appeals Sixth Circuit.

Jan. 25, 1963.

8. See Adams v. Davison-Paxon Company, 230 S.C. 532, 96 S.E.2d 566 (1957); Marchbanks v. Duke Power Co., 190 S.C. 336, 2 S.E.2d 825 (1939).

**672**

Donald M. Waesche, Jr., New York City (Dickinson, Wright, McKean & Cudlip, Detroit, Mich., Bigham, Englar, Jones &

Houston, New York City, on the brief; Fred W. Freeman, Detroit, Mich., and Donald M. Waesche, Jr., New York City, of counsel), for appellants.

Lucian Y. Ray, Cleveland, Ohio (Mc-Creary, Hinslea & Ray, Cleveland, Ohio, McMillan, Binch, Stuart, Berry, Dunn, Corrigan & Howland, Toronto, Canada, on the brief; Lucian Y. Ray, Cleveland, Ohio, and F. O. Gerity, Toronto, Canada, of counsel), for appellees.

Before MILLER and O'SULLIVAN, Circuit Judges, and WILLIAM E. MILLER, District Judge.

WILLIAM E. MILLER, District Judge.

On June 25, 1959 a collision occurred in a dense fog on Lake Huron between the S. S. "Monrovia," registered in Liberia, and the S. S. "Royalton," a Canadian vessel. The Monrovia sank, her cargoes were lost, and a number of her seamen were injured. The cargo owners and underwriters, and the injured seamen, brought libels against the Royalton and her owner, Scott Misener Steamships, Limited, to recover for the lost cargoes and for personal injuries. The District Court, finding that there were no faults in the navigation and operation of the Royalton which contributed to the collision, dismissed the libels. The only question presented on the libelants' appeal is whether there were faults on the part of the Royalton which contributed to the collision. Material facts on this issue are as follows:

The Dominion Marine Association of Canada and the United States Lake Carriers Association have prescribed, for vessels enrolled in the Associations, a separation of routes for upbound and downbound traffic on Lake Huron. The prescribed routes are separated by a safety zone 7 miles in width, with upbound traffic keeping to the west and downbound traffic keeping to the east of the safety zone. These routes are shown on Lake charts.

The Monrovia was a Liberian empire type Liberty vessel 447 feet, 7 inches in

length, and 56 feet, 2 inches in width. On the day of the collision, she was proceeding up Lake Huron during her maiden Great Lakes voyage, laden with a cargo of steel. She was not equipped with radar but had a ship-to-ship radio telephone. Her officers and crew were Greek citizens. Apparently only her master and radio operator understood or spoke English. She had taken on a Canadian pilot at Port Weller, Ontario, but dropped him at Lake Huron Lightship at the lower end of the Lake. The Canadian pilot, prior to his departure, advised the master of the Monrovia to use his radio in case of "thick weather," and to follow the up and down recommended courses shown on the Lake charts.

The Royalton is a Great Lakes bulk carrier 536.5 feet in length, 58.25 feet in width, and 31.2 feet in depth. Her net tonnage is 5,194 tons. She was equipped with radar and ship-to-ship radio telephone. On the day of the collision, she was proceeding down Lake Huron, en route from Duluth, Minnesota, to Montreal, Canada, laden with a cargo of grain. At approximately 6:15 a. m., she took her departure from Detour Light at the head of the Lake and set her course for Middle Island off the northeast coast of Michigan. When she was abeam of Middle Island, her course was set at 161 degrees true, and she proceeded down the Lake toward Sarnia at the lower end of the lake. At about 11:45 a. m., after encountering limited visibility, her engine room was put on "standby" and fog signals were sounded. At about 12:45 p. m., she heard a security call from the S. S. "Victorious," to the effect that that vessel had just had a "narrow scrape" with a salt water vessel on the downbound course.

At 1:05 p. m., when the Royalton was abeam of Thunder Bay Island Light, her mate determined from radar observations that she was 9.6 miles east of the Light. This position was 1.9 miles inside the safety zone. Her course was then altered 2 degrees to port, or left.

At 1:20 p. m., a pip, or target, appeared on the Royalton's radarscope. The master and mate determined that the target was 2 degrees on the Royalton's starboard bow and approximately 13 miles away. A 5-degree alteration to port was then made and the radarscope was kept under constant observation.

At about 1:32 p. m., when the target's distance had closed to about 10 miles and its bearing had widened to 12 degrees on the Royalton's starboard bow, her course was again altered 5 degrees to port.

At about 1:40 p. m., when the target was approximately 5 miles distant and its bearing had further widened to 30 degrees, the Royalton heard a fog signal 30–35 degrees on her starboard bow. A security call on her radio to the other ship, later identified as the Monrovia, was unanswered. Her course was again altered to port, this time by 12 degrees, and her engines reduced to "slow speed." A two-blast signal was sounded by the Royalton to indicate a starboard-to-starboard passing and fog signals were placed on automatic. Not receiving a reply to the passing signal, her master again attempted to reach the Monrovia on the radio, but without success. A second two-blast passing signal was sounded by the Royalton a few minutes after the first. This time the Monrovia answered with one blast, which, under the existing conditions, indicated a crossing rather than a passing. The Royalton's engines were then ordered full speed astern and danger signals were sounded. About 4 minutes later her engines were ordered double full astern. According to her deck log, the orders for "full speed astern" and "double full astern" were given at 1:50 p. m., and 1:54 p. m., respectively. At about the time of the order for "double full astern," the Monrovia suddenly executed a radical alteration in course to her right. The Royalton's second mate, who was in charge of the radar, saw the bearing of the Monrovia rapidly closing, and informed the master that "he is heading right on us," or words to that

effect.[1] The Monrovia then emerged from the fog about 45 degrees on the Royalton's starboard bow. She was swinging on a hard right rudder at what appeared to be full speed ahead. The ships collided at an angle of 90 degrees, the time being recorded in the Royalton's deck log as 1:57 p. m. The point of contact was the stem of the Royalton and the port side of the Monrovia between the number 1 and number 2 holds. At the time of contact, the Royalton was either stopped or was making some sternway and her bow was canting to the right from the effects of her reversed propeller. The place of the collision was .9 mile west of the downbound course and 6.1 miles east of the upbound course.

■ While the parties are in sharp disagreement in their analyses of the evidence concerning times, distances, and the speed of the Royalton, we believe that the facts set out above, which are, with some implementations, substantially the facts as found by the District Court, are established by a preponderance of the evidence. Furthermore, we are governed by the well established rule that in an admiralty case in which the testimony is contradictory and the exact facts difficult to ascertain, the findings of the District Judge who saw and heard the witnesses will not be set aside unless clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; West Tennessee Limestone Co. v. Federal Barge Lines, 288 F.2d 663 (C.A.6, 1961); City of Cleveland v. Bridget McIver et al., 109 F.2d 69, 71 (C.A.6, 1940); The William A. Paine, 39 F.2d 586, 588 (C. A.6, 1930).

■ Although we accept the District Court's findings of fact, we are nevertheless of the opinion that the Royalton was guilty on the facts found by the District Court, as implemented herein, of two contributory faults: first, in failing to utilize all available means to reduce speed to bare steerageway at once when,

at 1:40 p. m., she heard the Monrovia's fog whistle 30–35 degrees on her starboard bow; and second, in failing to reverse engines when her first two-blast passing signal was not answered.

Rule 15 of the Rules of the Road for the Great Lakes, 33 U.S.C. § 272, provides:

"Every vessel shall, in thick weather, by reason of fog, mist, falling snow, heavy rain storms, or other causes, go at moderate speed. *A steam vessel hearing, apparently not more than four points from right ahead, the fog signal of another vessel shall at once reduce her speed to bar steerageway, and navigate with caution until the vessels shall have passed each other.*" (Emphasis added.)

The District Court held that since the Royalton, upon hearing the Monrovia's fog signal, *took action* at once by checking engines to slow speed ahead while the vessels were still 5 miles apart, Rule 15 was not violated. We believe this was error.

Under normal conditions, the reduction in engine revolutions to slow speed ahead and the 12-degree alteration to port might have satisfied minimum requirements of the statutory Rules of the Road and dictates of good seamanship. But the conditions at that time were far from normal and the situation at hand called for the utmost in precautionary action. The Royalton was forewarned by the security call from the Victorious, which was down lake and ahead, that that vessel had had a "narrow scrape" with a salt water vessel upbound on the downbound course; when the pip first appeared on her radarscope at 1:20 p. m. and 13 miles distant, she suspected that it might be the upbound salt water vessel; from subsequent radar observations she knew or should have known that the other vessel was not only far off the upbound course, but was dangerously close to the down-

---

1. This sudden maneuver by the Monrovia was seen on the radarscope of the S. S. "Manske" which was downbound and about five miles east and abreast of the Royalton.

bound lane; she was not plotting her own radar readings to determine the exact course and speed of the other ship; she knew that notwithstanding her own alterations to port allegedly made to give the approaching ship a "wide berth," the distance separating the vessels had continued to close; when the distance had closed to 5 miles and she heard fog whistles not more than 4 points off her starboard bow, her security call to the approaching vessel was not answered; and, finally, she knew or should have known that she was still inside the safety zone. Each succeeding development portended increasing danger, and when she heard the Monrovia's fog whistle and received no response to her radio call, she knew or should have known that the approaching ship's navigation was highly erratic, that its intentions had not been ascertained, and that it was no longer safe to rely upon precautions usually taken when ships are passing each other under normal conditions. If she desired to maintain her headway, she should have made a radical change in course and put herself beyond reach of the approaching vessel, which, in open waters, she could have done. Since she did not do this, but instead elected to pass, she was required by the statutory rule to reduce speed to bare steerageway at once. This she could have done only by reversing engines until her bare steerageway of 3 miles per hour was accomplished. And shortly thereafter when she received no responses to her two-blast passing signal and her radio call, caution required that she reverse engines immediately and stop until the intentions of the other ship could be ascertained with certainty. Nevertheless, she was content to order engines checked to slow speed ahead—an order which, because of her forward momentum, would bring her to bare steerageway only after the elapse of approximately ten minutes.

We are of the opinion that the District Court's holding that the Royalton complied with Rule 15 by checking engines to slow speed ahead when she heard the Monrovia's fog signal, is in conflict with the decision of this court in The Martin Mullen, 260 F. 916 (C.A.6, 1919), in which the S. S. "Oakes" was found at fault for proceeding at an immoderate rate of speed and for failing at once to reduce her speed to bare steerageway upon hearing fog signals not more than 4 points from right ahead. The pertinent facts in that case are strikingly similar to those in the case at bar: The Oakes heard fog signals ahead. On hearing these signals she checked to dead slow and sounded a two-blast passing signal. She received no response. Five minutes later she blew a second two-blast passing signal, which was answered by a like signal from the Mullen, indicating that that vessel was dangerously near and slightly to the starboard of dead ahead. The Oakes' engines were then reversed and put full speed astern. Concerning the faults of the Oakes, this Court stated:

"We think the Oakes was rightly held guilty of fault contributing to the collision. In our opinion she ran through the fog at an immoderate speed within the meaning of rule 15 pertaining to navigation on the Great Lakes. She actually entered the fog at her full speed of 11 miles an hour. After entering the fog the Mullen's fog signals indicated to the Oakes that she was, at the most, not more than one or two points from right ahead. *The Oakes did not at once reduce her speed to bare steerageway, as the rule required, but contented herself with making such check as would ultimately bring the speed to dead slow.* She had apparently run at least five minutes under that check and had not yet reached bare steerageway before she reversed, *and this she did only (as the court found) on hearing the Mullen's passing signal, which indicated her dangerous nearness. Whether the reverse was made a half minute before receiving this passing signal is not important. Danger meanwhile was the more to be apprehended from the fact that the Mullen had not replied to the Oakes' first passing sig-*

*nal.* Had the Oakes been at moderate speed when she entered the fog, *and later reduced to bare steerageway when the Mullen's fog signals were heard,* the collision would probably have been avoided." (Emphasis added.) 260 F. at p. 918.

■ The Royalton's second and most serious fault was her failure to reverse engines and come to a stop when her first passing signal was not answered. It is well settled that if a steamer be approaching another vessel which has disregarded her signals, or whose position or movements are uncertain, she is bound to stop until the course and intentions of the other vessel be ascertained with certainty. The New York, 175 U.S. 187, 201, 20 S.Ct. 67, 44 L.Ed. 126. A vessel which has signaled by two blasts that she intends passing to starboard instead of to port, and receives no assenting response, is in duty bound to stop, reverse and, if necessary, come to a standstill, until the course, position and movements of the other vessel have been ascertained with certainty and the risk of collision removed. The Munaires, 1 F.2d 13, 15 (C.A.2, 1924). See also: A. H. Bull S. S. Co. v. United States, 34 F.2d 614, 616 (C.A.2, 1929); United States v. Grant, 11 F.2d 700 (C.A.1, 1926). In The New York, supra, 175 U.S. at page 207, 20 S.Ct. at page 74, the Supreme Court stated:

"The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect."

Appellees point out that the ships were still 5 miles apart when the Royalton's first two-blast passing signal and radio call were not answered. Of course, there could be no collision until the gap closed. However, as heretofore noted, the engine check to slow speed ahead would not bring her to steerageway of 3 miles per hour until after 10 minutes; and tests made following the collision showed that even with her speed reduced to 3 miles per hour, the orders for full and double full astern could not have brought her to a standstill until the elapse of another 6½ to 7 minutes. During this 17-minute interval, the Monrovia, proceeding at her speed of 11.5 miles per hour, would cover more than 3 miles of the distance separating the vessels, thus leaving the Royalton less than 2 miles within which to stop. It is of no avail to the Royalton that at the instant of the accident her momentum had been overcome in response to the "full speed astern" and "double full astern" orders which were given after her second passing signal and the Monrovia's responsive crossing signal, cf. Lie v. San Francisco & Portland S. S. Co., 243 U.S. 291, 299, 37 S.Ct. 270, 61 L.Ed. 726; or that the Monrovia veered sharply to starboard across her bow moments before the collision, cf. Partenreederei Wallschiff v. The Pioneer, 164 F.Supp. 421 (E.D.Mich., 1958), aff'd 6 Cir., 287 F.2d 886. She had committed herself before she reversed engines, and thereafter she was unable to extricate herself.

■ Under all of the circumstances shown by the record, we are of the opinion that cautious navigation under Rule 15 required the Royalton, when her first two-blast passing signal was not answered, to stop, and, if necessary, to reverse, until the exact course, position and intentions of the Monrovia could be ascertained with certainty. Hawgood Transit Co. v. Mesaba S. S. Co., 166 F. 697, 701 (C.A.6, 1909).

■ Since the Royalton's two faults were violations of a statutory rule of navigation (Rule 15), the heavy burden rests upon her to show not merely that her faults *might not* have been causes, but that such faults *could not* have contributed to the collision. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148; Pure Oil Company v. Union Barge Line Corporation, 227 F.2d 868, 874 (C.A.6, 1955); Eastern S. S. Co. v. International Harvester Co. of N. J., 189 F.2d 472, 476 (C.A.6, 1951); Pittsburg S. S.

Co. v. Duluth S. S. Co., 222 F. 834, 835–836 (C.A.6, 1915); Hawgood Transit Co. v. Mesaba S. S. Co., supra, 166 F. at p. 702. The Royalton, as we evaluate the evidence, has wholly failed to show that the accident could not have been avoided if she had at once reduced speed to bare steerageway when she heard the Monrovia's fog signal, or if she had reversed engines when she received no assent to her first passing signal.

By agreement of the parties, the District Court adjudicated only the issue of liability of the Royalton and her owners. Since our conclusions with respect to violations of Rule 15 (33 U.S.C. § 272) are dispositive of the appeal and must result in a reversal of the District Court's final decree exonerating the Royalton, we find it unnecessary to pass upon other points raised in the briefs.

Accordingly, the judgment of the District Court is reversed and the cause is remanded with directions to enter an appropriate decree consistent with this opinion.